184 P.3d 780

**Margret GILLAN and Howard Keller, M.D., Plaintiffs–Appellees,**

v.

**GOVERNMENT EMPLOYEES INSURANCE COMPANY, Defendant–Appellant,**

**and**

**John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Roe "NON–Profit" Corporations 1–10; and Roe Governmental entities 1–10, Defendants.**

No. 28075.

Intermediate Court of Appeals of Hawai'i.

April 17, 2008.

Kathy K. Higham (Kessner Duca Umebayashi Bain & Matsunaga), Honolulu, for Defendant–Appellant.

Roy K.S. Chang and Harvey M. Demetrakopoulos (Shim & Chang), Honolulu, for Plaintiffs–Appellees.

David A. Webber and Deborah Day Emerson, Deputy Attorneys General for Amicus Curiae State of Hawai'i, by J.P. Schmidt, Insurance Commissioner.

Katherine M. Nohr (Miyagi, Nohr & Myhre), Honolulu, for Amici Curiae Hawaii Insurers Council.

FOLEY, PRESIDING JUDGE, NAKAMURA and FUJISE, JJ.

Opinion of the Court by FOLEY, P.J.

Defendant–Appellant Government Employees Insurance Company (GEICO) ap-

peals from the Amended Partial Judgment filed on July 17, 2006 in the Circuit Court of the First Circuit (circuit court).[1] The circuit court entered judgment against GEICO and in favor of Plaintiffs–Appellees Margret Gillan (Gillan) and Howard Keller, M.D. (Dr. Keller) (hereinafter collectively referred to as Plaintiffs) on Plaintiffs' claim that GEICO violated Hawaii Revised Statutes (HRS) § 431:10C–308.5 (2005 Repl.)[2] by basing its denial of Gillan's claim for Personal Injury Protection (PIP) benefits on the opinion of a doctor whom GEICO had chosen, without Gillan's approval, to review Gillan's medical records.

On appeal, GEICO contends the circuit court erred by granting partial judgment against GEICO and in favor of Plaintiffs because the judgment was based on an erroneous interpretation of HRS § 431:10C–308.5(b).

## I.

This case arose from GEICO's refusal to approve Gillan's claim for PIP benefits. Gillan was injured in a car accident on or about December 15, 2002, while riding as a passenger in a car insured by GEICO. It is undisputed that at the time of the accident, Gillan was entitled to treatment under PIP coverage of the GEICO policy. Gillan did receive chiropractic treatment and acupuncture, which were paid for by GEICO as PIP bene-

fits. After receiving chiropractic treatment on March 24, 2003, Gillan did not submit a claim for PIP benefits to GEICO until her September 29, 2003 visit to Dr. Keller.

On November 12, 2003, GEICO hired Bruce Hector, M.D., (Dr. Hector) to review Gillan's medical records. In his report, dated December 8, 2003, Dr. Hector opined that Gillan's "current subjective complaints" had likely been caused by "temporal factors such as poor posture or bad sleeping position rather than long-term sequelae consequent to the accident of 12/15/02." Further, he concluded that Gillan "medically probably reached to preinjury status by April 1, 2003." He determined that Gillan should not continue to receive "passive" treatments.

Gillan also made claims to GEICO for treatment she received from Dr. Keller on December 11, 2003 and October 30, 2004, and for Magnetic Resonance Imaging services from Castle Medical Center that she received on March 18, 2005. GEICO denied these claims for the following reasons:

1. Based on a report written by [Dr. Hector], dated 12/08/03, Dr. Hector notes cessation of medical treatment, encouragement to return to a normal lifestyle, with provision of home exercise program.

2. Pursuant to HRS 431:10C–103.5(a), Treatment is not appropriate, reasonable and necessary.

---

1. The Honorable Sabrina S. McKenna presided.

2. HRS § 431:10C–308.5(b) (2005 Repl.) provides:

§ 431:10C–308.5 Limitation on charges.

. . . .

(b) The charges and frequency of treatment for services specified in section 431:10C–103.5(a), except for emergency services provided within seventy-two hours following a motor vehicle accident resulting in injury, shall not exceed the charges and frequency of treatment permissible under the workers' compensation supplemental medical fee schedule. *Charges for independent medical examinations, including record reviews, physical examinations, history taking, and reports,* to be conducted by a licensed Hawaii provider unless the insured consents to an out-of-state provider, shall not exceed the charges permissible under the appropriate codes in the workers' compensation supplemental medical fee schedule. The workers' compensation supplemental medical fee

schedule shall not apply to independent medical examinations conducted by out-of-state providers if the charges for the examination are reasonable. *The independent medical examiner shall be selected by mutual agreement between the insurer and claimant;* provided that if no agreement is reached, the selection may be submitted to the commissioner, arbitration or circuit court. The independent medical examiner shall be of the same specialty as the provider whose treatment is being reviewed, unless otherwise agreed by the insurer and claimant. All records and charges relating to an independent medical examination shall be made available to the claimant upon request. The commissioner may adopt administrative rules relating to fees or frequency of treatment for injuries covered by personal injury protection benefits. If adopted, these administrative rules shall prevail to the extent that they are inconsistent with the workers' compensation supplemental medical fee schedule.

(Emphasis added.)

On April 15, 2005, Plaintiffs filed a Complaint against GEICO, alleging that the insurer had wrongfully denied Gillan's claim. Among other things, Plaintiffs alleged that GEICO had "wrongfully resorted to hiring doctors to do records [sic] reviews in an attempt to circumvent the requirements of HRS § 431:10C–308.5(b)."

GEICO filed its answer to the Complaint on June 9, 2005.

On September 8, 2005, Plaintiffs filed a Motion for Partial Summary Judgment (Motion for Partial SJ), requesting the circuit court to find that GEICO had breached the requirements of HRS § 431:10C–308.5(b) and wrongfully denied PIP benefits owed to Gillan and payments owed to Dr. Keller. Plaintiffs also alleged that GEICO had hired Dr. Hector to conduct an Independent Medical Examination (IME) without Gillan's agreement.

On October 3, 2005, GEICO filed its opposition memorandum, in which it argued that the circuit court should deny the motion for the following reasons:

A. Neither a physical examination of a PIP claimant or [sic] even a medical opinion is a statutory condition to an insurer denying any PIP claim;

B. The legislature describes a record review as an "ancillary procedure incident to the conducting of an IME" and not, by itself, an [IME];

C. The Insurance Commissioner sanctions the use of record reviews in PIP denials, including when the PIP claimant has no say in the selection of the record reviewer;

D. GEICO is entitled to have a jury determine whether either [Gillan or Dr. Keller] is entitled to the disputed PIP benefits.

On October 6, 2005, Plaintiffs filed their reply memorandum, in which they argued that the requirements set forth in HRS § 431:10C–308.5(b) applied to record reviews.

On October 20, 2005, the circuit court filed its "Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment" (Order), which provided in relevant part:

A. H.R.S. SECTION 431:10C–308.5 PLAINLY AND UNAMBIGUOUSLY INCLUDES "RECORDS [sic] REVIEWS" WITHIN "[IMEs]," WHICH REQUIRES MUTUAL AGREEMENT AS TO THE IDENTITY OF THE REVIEWER.

. . . .

This motion requires that this court construe this statute to determine whether the "records [sic] review" conducted by DR. HECTOR is an [IME]. If so, "mutual agreement" between GILLAN and GEICO would have been required regarding the identity of the examiner to perform the records [sic] review. There is no dispute that no consent was obtained.

. . . .

According to H.R.S. Section 431:10C–308.5(b) an "[IME]" plainly and obviously includes "record reviews," such as the one conducted by DR. HECTOR. Accordingly, pursuant to the "plain, unambiguous and explicit" terms of the statute, GEICO was required to obtain GILLAN'S "mutual agreement" before selecting DR. HECTOR to conduct the "record review."

This court is aware that Judge Susan Oki Mollway, for whom this court has the utmost respect, in construing the same statute, ruled [in *Engle v. Liberty Mutual Fire Ins. Co.*, 402 F.Supp.2d 1157, 1164 (D.C.Hawai'i 2005),] that a records [sic] review is *not* an [IME]. In so ruling, she expressed her belief "that the Hawaii Supreme Court would not apply IME statutory requirements to a mere record review or to an opinion based only on a record review." For the additional reasons stated below, this court believes that if faced with the question, the Hawaii Supreme Court would instead hold, as previously ruled by Judge Bert Ayabe of this First Circuit Court, [in *Sakoda v. AIG Hawaii Ins. Co.*, Civil No. 04–1–0436–03(BIA)], that not only a plain reading of the statute, but also, its legislative history, "indicate that an [IME] . . . includes record reviews[.]"

B. ADDITIONAL PRINCIPLES OF STATUTORY CONSTRUCTION SUPPORT THE CONCLUSION THAT

H.R.S. SECTION 431:10C–308.5 IN-
CLUDES "RECORDS [sic] REVIEWS"
WITHIN "[IMEs]," WHICH ARE
SUBJECT TO MUTUAL AGREE-
MENT.

. . . .

1. *Legislative History*

For the following reasons, it appears
that the legislature intended to include a
"record reviews" [sic] within the "[IMEs]"
requiring mutual agreement.

. . . .

[I]n 1998, the Legislature specifically in-
cluded [in HRS § 431:10C–308.5] "record
reviews, physical examinations, history
taking, and reports" under "[IMEs]" for
PIP purposes, and limited charges for such
examinations and reviews to permissible
charges under workers' compensation
schedules. In so amending the statute, the
Legislature in Conference Committee Re-
port No. 117 [3] stated:

> The purpose of this bill is to continue
> the reforms enacted in Act 251, Session
> Laws of Hawaii 1997. In the years prior
> to passage of Act 251, Hawaii's consum-
> ers paid the highest auto insurance pre-
> miums in the nation in some years and
> the second highest in other years. Since
> the passage of Act 251, Hawaii's con-
> sumers have already realized significant
> savings. Preliminary data indicates that
> this favorable downward trend will con-
> tinue.

> Your Committee was committed to
> *continuing the trend of decreasing auto-
> mobile insurance rates for our driving
> public,* and to that end, has focused on
> clarifying existing provisions and making
> technical corrections to Act 251.
> *Amendments to strengthen the provi-
> sions of Act 251 and effectuate its pur-
> pose of creating a fair and equitable
> system that delivers maximum benefits
> with the greatest efficiency and the low-
> est cost are included.* In summary, H.B.
> No. 2823, H.D. 1, S.D. 1, C.D. 1 contains
> the following amendments:

> . . . .

(9) *The bill incorporates measures de-
signed to eliminate abuses and excessive
charges associated with [IMEs].* The bill
clarifies that the workers' compensation
fee schedule charge allowable for IMEs
may not be exceeded by submitting a
separate charge for the report or other
ancillary procedures incident to the con-
ducting of an IME. The practice of
charging up to several thousand dollars
in excess of the permissible fee under
the workers' compensation schedule for
consultation for a complex medical prob-
lem violates the cost containment provi-
sion.

. . . .

Thus, the Legislature specifically includ-
ed "record reviews" under the PIP IME
statute for the explicit purpose of cost
containment.

GEICO argues that the language of sub-
section (9) supports [ ] its position that DR.
HECTOR's record review did not require
GILLAN's mutual agreement, focusing on
the portion which refers to "the report *or
other ancillary procedures incident to the
conducting of an IME.*" According to GEI-
CO, this means that "records [sic] reviews"
were also considered ancillary to the con-
ducting of an IME.

At first blush, GEICO's argument ap-
pears to make sense. However, if the
Legislature's purpose in amending the
statute was to limit costs, GEICO's inter-
pretation would be counterproductive.
Excepting "record reviews" from IMEs
subject to fee limitations under workers'
compensation fee schedules would not ad-
vance the stated legislative purpose of
"continuing the trend of decreasing auto-
mobile insurance rates for our driving pub-
lic." Otherwise, PIP insurers would be
free to retain out-of-state examiners to
conduct record reviews, who would not be
subject to the fee limitations. Costs would
also be increased by the necessity of hav-
ing PIP insurers fly out-of-state examiners
into the State to testify when a PIP denial
is challenged in court, as in this case.

---

**3.** Conference Committee Report No. 117 per-
tained to H.B. No. 2823, which became Act 275.
1998 Haw. Sess. L. Act 275, at 922. Section 26
of Act 275 amended HRS § 431:10C–308.5(b),
effective July 20, 1998. 1998 Haw. Sess. L. Act
275, § 26 at 935.

Also without merit is GEICO's argument that including "record reviews" within IMEs would allow such reviews to be charged at the same rate as full IME's [sic]. H.R.S. Section 431:10C–308.5 *limits* charges to those permitted under workers' compensation schedules; it does not *mandate* that the full amount allowed under [sic] be charged for a record review that takes less time.

(b) 2000 Amendments to H.R.S. Section 431:10C–308.5

The legislative history of the 2000 amendments to H.R.S. Section 431:10C–308.5 show that the Legislature intended to include "record reviews" within the mutual agreement requirements of H.R.S. Section 431:10C–308.5.

Sections and 2 [sic] of Act 138 of 2000 amended H.R.S. Sections 431:10C–304 and 431:10C–308.5 in pertinent part as follows, with new material underscored and deleted material bracketed:

§ 431:10C–304 **Obligation to pay personal injury protection benefits.** For purposes of this section, the term "personal injury protection insurer" includes personal injury protection self-insurers. Every personal [sic] shall provide personal injury protection benefits for accidental harm as follows:

. . . .

*(6) Disputes between the provider and the insurer over the amount of a charge or the correct fee or procedure code to be used under the workers' compensation supplemental medical fee schedule shall be governed by section 431:10C–308.5;*

. . .

. . . .

§ 431:10C–308.5 **Limitation on charges.**

. . . .

(b) The charges and frequency of treatment for services specified in section 431:10C–103.5(a), except for emergency services provided within seventy-two hours following a motor vehicle accident resulting in injury, shall not exceed the charges and frequency of treatment permissible under the workers' compen-

sation [schedules] *supplemental medical fee schedule.* Charges for independent medical examinations, including record reviews, physical examinations, history taking, and reports, to be conducted by a licensed Hawaii provider unless the insured consents to an out-of-state provider, shall not exceed the charges permissible under the [workers' compensation schedules for consultation for a complex medical problem.] *appropriate codes in the workers' compensation supplemental medical fee schedule.* The workers' compensation [schedules] *supplemental medical fee schedule* shall not apply to independent medical examinations conducted by out-of-state providers [provided that] *if* the charges for the examination are reasonable. *The independent medical examiner shall be selected by mutual agreement between the insurer and claimant; provided that if no agreement is reached, the selection may be submitted to the commissioner, arbitration or circuit court. The independent medical examiner shall be of the same specialty as the provider whose treatment is being reviewed, unless otherwise agreed by the insurer and claimant.* All records *and charges* relating to an independent medical examination shall be made available to the claimant upon request. The commissioner may adopt administrative rules relating to fees or frequency of treatment for injuries covered by personal injury protection benefits. If adopted, these administrative rules shall prevail to the extent that they are inconsistent with the workers' compensation [schedules] *supplemental medical fee schedule.*

. . . .

*(e) In the event of a dispute between the provider and the insurer over the amount of a charge or the correct fee or procedure code to be used under the workers' compensation supplemental medical fee schedule, the insurer shall:*

*(1) Pay all undisputed charges within thirty days after the insurer has received reasonable proof of the fact and amount of benefits accrued and demand for payment thereof; and*

*(2) Negotiate in good faith with the provider on the disputed charges for a period of up to sixty days after the insurer has received reasonable proof of the fact and amount of benefits accrued and demand for payment thereof. If the provider and the insurer are unable to resolve the dispute, the provider, insurer, or claimant may submit the dispute to the commissioner, arbitration, or court of competent jurisdiction. The parties shall include documentation of the efforts of the insurer and the provider to reach a negotiated resolution of the dispute.*

. . . .

According to Conference Committee Report No. 37 on H.B. 2476, which became Act 138 of 2000:

The purpose of this measure is to make several amendments to the motor vehicle insurance law.

Specifically, the measure:

(1) Establishes a process for selecting an [IME] physician that requires the parties' agreement to the selection, and lacking an agreement, mandates the Director of Labor and Industrial Relations to select a physician from a list maintained by the Department of Labor and Industrial Relations.

. . . .

(3) Requires that the IME provider in motor vehicle insurances [sic] cases be selected by mutual agreement of the parties, and failing an agreement, be appointed by the Insurance Commissioner from a list of providers maintained by the Insurance Division; . . .

. . . .

Your Committee has amended this measure to establish a fair selection procedure that favors selection by agreement. Where the parties are unable to agree, a neutral forum (Department of Commerce and Consumer Affairs, arbitration, or circuit court) will make the selection. It is emphasized that the selection should not be a perfunctory matter, but that every effort should be made to select a neutral examiner with a bal-anced approach that favors neither insurer or [sic] claimant. *Those examiners who have acquired reputations for favoring one side or the other should not be selected. Examiners who are primarily treating doctors who are familiar with community treatment protocols, injury patterns and cultural factors, that do not rely heavily on IME income that affect bias, are to be favored.*

*The specialty provision in Section 2 of the bill insures that IME doctors possess adequate knowledge to properly evaluate the treatment rendered by the treating doctor or medical provider.*

*It is not the intention of the Committee on Conference to require multiple independent medical examiners in the ordinary case, but rather than [sic] an independent medical examiner should be selected that is most appropriate under the circumstances of the treatment rendered.*

. . . .

At first blush, this Conference Committee Report does not make clear whether "record" [sic] reviews" were intended to be included. However, the legislative intent clearly was to avoid biased examiners, and to favor selection of neutral examiners by agreement. In addition, the intent was also to require that the reviewing examiner be of the same specialty as the examiner whose treatment was being questioned.

Importantly, however, the last paragraph of the Report states that multiple examiners are not necessary where treatment by providers by more than one specialty are being reviewed. Whether or not the examiner conducts a physical examination of the patient, with respect to providers of differing specialties, the examiner is necessarily conducting a "records [sic] review."

Legislators' statements on the floor regarding this Conference Committee Report support an interpretation that the legislative intent was to include "records [sic] review" in the mutual agreement requirement. According to Representative Ron

Menor, who served as one of five "managers on part of the House" with respect to the proposal:

"Furthermore, I would like to clarify that the 'same specialty' provision in this bill was added at the request of the doctors.

"Doctors representing the Hawai'i Medical Association who requested this language were concerned about *the use of unqualified persons performing IME reviews of their work.* I agreed to do so because I felt that the inclusion of this requirement made common sense.

"*For example, it makes sense to require a neurosurgeon IME to review spinal surgery performed by a treating neurosurgeon.* Otherwise, the IME doctor could be an internist or even a gynecologist who knows little or nothing about neurosurgery. *Moreover, it would not make sense to allow an IME psychiatrist to review the treatment of a broken leg by an orthopedist. In addition, a person performing an IME review of a knee reconstruction by an orthopedic surgeon should have training in orthopedic surgery.*

"However, I recognize and am sensitive to the concerns that have been expressed about the wording of the 'same specialty' provision in the bill. To address these concerns, language has been included in the committee report to clarify legislative intent that we are not limiting doctors to narrow categories, but than [sic] any doctor in any specialty should be allowed to perform an IME provided that they 'possess adequate knowledge necessary to properly evaluate the treatment rendered by the treating doctor or medical provider.' ... [sic]

"Another important point that needs to be made is that this measure will not result in any increased cost in auto insurance. ...

"It should also be emphasized that this bill doesn't prevent the use of IMEs which I believe can be effective [sic] and helpful tool in preventing unnecessary and costly medical treatment. There is no shortage of IME doctors in any of the IME specialties most commonly involved in automobile insurance cases.

"For all these reasons, I believe that this bill is a pro-consumer measure and I ask my colleagues to support this bill."

Representative Menor's comments indicate that Legislature [sic] was concerned about the specialities and qualifications of examiners *reviewing the work performed by providers,* not evaluating the current physical condition of a claimant. His examples about surgeons reviewing the work of other surgeons suggest a records [sic] review, not physical examinations.

Representative Romy Cachola, another one of the "managers on part of the House" with respect to the proposal, stated:

. . . .

"... *[T]his bill should not be narrowly interpreted to gain any legal and financial advantages for all parties involved in the IME selection process.*

*I believe that the goals of the specialty provision of this bill are: 1) to select an IME that is for the best interest of the claimant; and 2) to control the cost of IME fees.*

[Emphasis added.] Adopting GEICO's position would give the insurer the advantage, would not be in the best interest of [Gillan], and would not control the cost of IME fees.

Thus, the legislative history of the 2000 amendments also support Plaintiffs' position.

2.   The Reason And Spirit of the Law

As stated by the Hawaii Supreme Court in *Government Employees Ins. Co. v. Hyman,* 90 [Hawai'i] 1, at 4[, 975 P.2d 211] (1999)[:]

... *More fundamentally, GEICO and the insurance commissioner fail to recognize that the relevant "right" underlying the no-fault laws is not the right to challenge denials of no-fault benefits, but the right to receive prompt, appropriate, and reasonable no-fault benefits according to the no-fault insurance contract and law. Specifically, the insured has a right to receive treatment of injuries* [citation omit-

ted], *and the provider has a right to receive payment for treatment rendered* [citation omitted]....

*... The right to challenge a denial of no-fault benefits is, in effect, secondary to the right to receive benefits in the first instance.*

In addition, as noted by the Hawaii Supreme Court in *U.S.A. v. Allstate Insurance Co.*, 69 Haw. 290, at 294, footnote 8[, 740 P.2d 550] (1987), the stated legislative purpose for the no-fault (now PIP) law was to "*[p]rovide for a speedy, adequate and equitable reparation for those injured or otherwise victimized ...[.]*"

Allowing insurers to choose favorable examiners to conduct records [sic] reviews, which leads to challenges, such as in this case, is not only not equitable, but is also not speedy, and is probably inadequate, considering necessary treatment can be delayed years through litigation.

Thus, the reason and spirit of the PIP law also favor Plaintiffs' position.

C. THERE IS NO EVIDENCE THAT THE INSURANCE COMMISSIONER HAS SPECIFICALLY ADDRESSED THE ISSUE OF WHETHER H.R.S. SECTION 431:10C–308.5 REQUIRES MUTUAL AGREEMENT REGARDING "RECORDS [sic] REVIEWS." IN ANY EVENT, ANY SUCH DECISION WOULD NOT BE ENTITLED TO A PRESUMPTION OF VALIDITY.

GEICO argues that the Insurance Commissioner has sanctioned the use of record reviews by examiners without mutual agreement in upholding PIP denials. GEICO cites to various administrative decisions in this regard.

There is no evidence, however, that any of the claimants or providers in those cases argued the points raised by the Plaintiffs here. In this regard, the court notes that H.R.S. Section 91–10(5) specifically provides that, in an agency review, the claimant or provider initiating the challenge carries the burden of proof.

In any event, this case does not involve an appeal of an agency decision, to which the presumption of validity would apply.

....

III. *CONCLUSION AND ORDER*

Pursuant to H.R.S. Section 431:10C–103.5, an insurer is required to pay PIP benefits for "appropriate and reasonable treatment and expenses necessarily incurred as a result of [ ] accidental harm" from a motor vehicle accident. The purpose of H.R.S. Section 431:10C–308.5 is to require an insurer to obtain mutual agreement from the claimant regarding the identity of the examiner to perform an IME, including a records [sic] review, if the insurer was questions [sic] whether past or future treatment meets this standard.

Plaintiffs' motion raises an issue addressed in *TIG Insurance Co. v. Kauhane*, 101 Hawai'i 311, 67 P.3d 810 (Hawai'i App. 2003), i.e., the proper remedy for a failure to comply with procedural requirements of the PIP law. In *Kauhane*, the Intermediate Court of Appeals ("ICA") held as follows:

We conclude that TIG violated the time requirements of H.R.S. § 431:10C–304(3)(C) when it delayed granting or denying Kauhane's claim for no-fault benefits pending (1) receipt of answers from Kauhane's treating physicians to TIG's questions regarding the underlying cause of the medical condition that required Kauhane to undergo bypass surgery a few days after a motor vehicle accident, and (2) Kauhane's undergoing two independent medical examinations (IMEs). We hold, however, that the Insurance Commissioner wrongly concluded that TIG's violation of these time requirements procedurally barred TIG from contesting the substantive merits of Kauhane's claim.

*Id.*, 67 P.3d at 812.

As in *Kauhane*, which did not provide a clear statutory remedy for the violation, Chapter 431:10C does not provide a specific remedy for a violation of H.R.S. Section 431:10C–308.5, other than the remedy under H.R.S. Section 431:10C–304(7), which subjects an insurer to civil penalties sections 431:10C–117(b) and (c). As was done in *Kauhane*, however, this court "must

construe the statute in a manner that would best effectuate the legislative purpose of the requirement imposed on an insurer" to obtain mutual agreement.

In this case, the Legislature mandated mutual agreement as to the identity of an examiner or reviewer, before an insurer could use the report of such an examiner or reviewer to deny PIP benefits. Accordingly, not allowing an insurer to rely on an IME obtained without mutual agreement to deny PIP benefits would best "construe the statute in a manner that would best effectuate the legislative purpose of the requirement imposed on an insurer."

Therefore, the court concludes that GEICO is prohibited from relying on DR. HECTOR'S report as a basis for its denial of PIP benefits to GILLAN for treatment rendered by DR. KELLER.

For all of the reasons stated above, the court hereby GRANTS Plaintiffs' motion, to the extent that it rules as follows:

That Defendant GEICO failed to comply with H.R.S. Section 431:10C–308.5 when it denied personal injury protection benefits to Plaintiff GILLAN and when it denied payments to Plaintiff HOWARD KELLER, M.D. for treatments rendered to Plaintiff Gillan based on a 'records [sic] review,['] by DR. HECTOR without obtaining mutual agreement from Plaintiff GILLAN as to DR. HECTOR as the reviewer. Therefore, GEICO is prohibited from relying on DR. HECTOR's report as a basis for its denial of PIP benefits to GILLAN for treatment rendered by DR. KELLER.

Through this motion, however, Plaintiffs also seek a ruling that, as a result, the denials were improper, null, and void. In this regard, GEICO also denied PIP benefits for DR. KELLER's treatment on a second, alternative basis:

2. "Pursuant to HRS 431:10C–103.5(a), Treatment is not appropriate, reasonable and necessary."

The law is clear that there is "[no] ... statutory presumption that medical treatments following a motor vehicle accident are the appropriate, reasonable, and necessary result of the accident as long as the treated injuries are of the kind produced by motor vehicle accidents." *Hoffacker v. State Farm Mut. Auto. Ins. Co.*, 101 Hawai'i 21, 61 P.3d 532, 535 (Hawai'i App. 2002).

In this case, Plaintiffs have the burden of proof. Plaintiffs' motion did not attach any affidavits, records, or other evidence that the treatment provided by DR. KELLER met the requisite standard, or that it met any other requirements for payment of PIP benefits. Plaintiffs only provided evidence that the bills were submitted to GEICO and were rejected.

Therefore, because Plaintiffs failed to meet their burden, the court denies their motion without prejudice to the extent it seeks a ruling that the denials were improper, null, and void.

(Bracketed material in original omitted and bracketed material added; footnotes in original omitted; footnote added; emphasis in original.)

On November 21, 2005, GEICO filed a Motion for [Hawai'i Rules of Civil Procedure (HRCP)] Rule 54(b)[4] Certification (Rule 54(b) Motion) of the Order. Plaintiffs filed a joinder in the motion. On January 19, 2006, the circuit court granted the Rule 54(b) Motion.

---

4. HRCP Rule 54(b) provides:

**Rule 54. JUDGMENTS; COSTS; ATTORNEYS' FEES.**

. . . .

**(b) Judgment upon multiple claims or involving multiple parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only *upon an express determination that there is no just rea-son for delay* and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
(Emphasis added.)

On February 27, 2006, the circuit court entered a Partial Judgment in favor of Plaintiffs and against GEICO, and GEICO appealed from that judgment. On May 30, 2006 in No. 27769, the Hawai'i Supreme Court dismissed GEICO's appeal because the February 27, 2006 Partial Judgment did not contain a finding that there was no just reason for delaying the entry of judgment, as required by HRCP Rule 54(b) when a judgment disposes of less than all of the claims.

On July 17, 2006, the circuit court entered an Amended Partial Judgment, which included a finding of no just reason for any delay in the entry of judgment. On August 2, 2006, GEICO appealed from the Amended Partial Judgment.

## II.

"We review the circuit court's grant or denial of summary judgment de novo." *Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (quoting *Durette v. Aloha Plastic Recycling, Inc.*, 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004)). The Hawai'i Supreme Court has often articulated that

> summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Querubin*, 107 Hawai'i at 56, 109 P.3d at 697 (quoting *Durette*, 105 Hawai'i at 501, 100 P.3d at 71).

HRCP Rule 56(e) provides in relevant part:

### Rule 56. SUMMARY JUDGMENT.

. . . .

(e) **Form of affidavits; further testimony; defense required.** . . . When a motion for summary judgment is made . . . , an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Thus, "[a] party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, 'nor is [the party] entitled to a trial on the basis of a hope that [the party] can produce some evidence at that time.'" *Henderson v. Prof'l Coatings Corp.*, 72 Haw. 387, 401, 819 P.2d 84, 92 (1991) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2727 (1983)).

## III.

GEICO contends the circuit court erred when it ruled that GEICO (1) violated HRS § 431:10C–308.5(b) by obtaining and relying on a record review as part of its PIP claim review and payment decision without agreement from Gillan on GEICO's choice of reviewing doctor, and (2) was prohibited at trial from relying on Dr. Hector's report as a basis for its denial of PIP benefits to Gillan because the rulings were based on an erroneous interpretation of HRS § 431:10C–308.5(b).

Simply put, the issue presented in this case is whether in the context of HRS § 431:10C–308.5(b), a "record reviewer" is an independent medical examiner. If the answer is "yes," then in the instant case, GEICO violated HRS § 431:10C–308.5 by selecting Dr. Hector to review Gillan's record without Gillan's approval. GEICO argues that the answer to the question is "no" and, therefore, GEICO did not violate HRS § 431:10C–308.5.

In support of its argument, GEICO cites to a change the Hawai'i legislature made in 1998 to HRS § 431:10C–308.5(b). Prior to

1998, the section provided in pertinent part that

> [c]harges for independent medical examinations to be conducted by a licensed Hawaii provider, unless the insured consents to an out-of-state provider, shall not exceed the charges permissible under the workers' compensation schedules for consultation for a complex medical problem.

HRS § 431:10C–308.5(b) (1993). The legislature amended, effective July 20, 1998, that part of the section to read:

> Charges for independent medical examinations, *including record reviews, physical examinations, history taking, and reports,* to be conducted by a licensed Hawaii provider ... shall not exceed the charges permissible under the workers' compensation schedules[.]

1998 Haw. Sess. L. Act 275, § 26 at 935 (emphasis in original; footnote omitted).

GEICO reasons that pursuant to Conference Committee Report No. 117, a record review is an "ancillary procedure[ ] incident to the conducting of an IME" and not, by itself, an IME. By implication, GEICO suggests that Dr. Hector, who conducted a mere record review, was not an "independent medical examiner."

GEICO cites to *Engle v. Liberty Mutual Fire Insurance Co.*, 402 F.Supp.2d 1157 (D.Hawai'i 2005), in support of this argument. *Engle* is not binding on this court, but provides some guidance on how we might interpret the section.

The facts in *Engle* were very similar to those in the instant case. Engle was a passenger in a car involved in an accident on May 2, 2003. 402 F.Supp.2d at 1158. The car was insured by Liberty Mutual, and Engle was entitled to benefits pursuant to the PIP provision of Liberty Mutual's policy. *Id.* Liberty Mutual paid for Engle's emergency room bills and her massage and chiropractic treatment through August 2003. *Id.* Sometime after November 2003, Liberty Mutual denied Engle further PIP benefits, based on a record review performed by a doctor Liberty Mutual had hired without Engle's approval. *Id.* at 1158 & 1161.

Engle filed suit against Liberty Mutual in circuit court, alleging, among other things, that Liberty Mutual had violated HRS § 431:10C–308.5(b) when it denied her claim. *Engle*, 402 F.Supp.2d at 1158. Liberty Mutual removed the case to the United States District Court for the District of Hawaii (District Court). *Id.* at 1158–59.

The District Court held that Liberty Mutual was not required to follow IME procedures set forth in HRS § 431:10C–308.5(b) for the record review because "a record review performed in isolation, without other accompanying procedures necessary to complete an IME, particularly an in-person examination," was not an IME. *Engle*, 402 F.Supp.2d at 1161. The District Court explained that the statute did not equate a record review with an IME:

> In its ordinary, natural meaning, the term "[IME]" refers to a procedure that includes an in[-]person examination. Numerous court orders, for example, use "IME" to refer to the "Physical and Mental Examination" procedures set forth in [HRCP Rule] 35 and Fed.R.Civ.P. [FRCP Rule] 35. Physical and mental examinations performed pursuant to [HRCP Rule] 35 and [FRCP Rule] 35 necessarily involve in-person examinations.... Courts routinely use the term "IME" to describe procedures in which in-person examinations were conducted.
>
> . . . .
>
> The more natural reading of the statute is to interpret "including" as meaning "having as parts." While the word "including" may certainly be used to introduce examples in various contexts, reading it as meaning "having as parts" requires fewer somersaults and interpolations in the context of the statute in issue. Indeed, *Black's Law Dictionary* [777 (8th ed.2004) ] lists "to contain as a part of something" as the definition of "include." If "including" means "having as parts," then the statute is referring to an IME made up of several parts such as history taking and record review, with history taking and record review not being IMEs on their own. In that event, "including" would be used much as it is used in the

statement "I prepared a brief, including doing the research, consulting with the client, drafting, and assembling exhibits." None of the items after "including" is itself a finished brief.

*Id.* at 1162–63 (some citations omitted).

The District Court went on to explain that Hawai'i's legislative history indicated that record reviews were not IMEs:

The purpose of the 1998 amendments was to require that charges for an IME include charges for all parts of the IME, not just for the physical examination portion. Thus, the statutory restrictions on IME charges extended to any record review, history taking, or report that was part of the IME. The legislative history does not indicate that the amendment was intended to subject record reviews that are not part of IMEs to IME regulations. To the contrary, the Committee Report [No. 117] distinguishes between IMEs and parts of IMEs such as "the report or other ancillary procedures incident to the conducting of an IME."

. . . .

The legislature's differentiation between an IME and a mere record review is logical. An insured has an interest in having a voice in which doctor will perform an IME because an in-person examination is a necessary part of an IME. An insured may be uncomfortable being examined by a doctor the insured knows is regularly retained by insurers and so may be biased against the insured. It is also conceivable that an insured whose medical problem involves, for example, sexual dysfunction, may want to be examined by a doctor of the same sex. Such concerns are substantially diminished when no in-person examination occurs. Creating differing requirements for IMEs, which require in-person examinations, and nonintrusive procedures like record reviews balances the competing needs of insureds and insurers.

. . . The legislature did not require an insurer to have any particular level of information before making a coverage determination. . . . [A]n insurer may deny benefits for medical treatment without a doctor's review of any kind. Such a deci-

sion may be based on a nurse's opinion, or on a review by an insurance administrator with no medical training. An IME certainly provides the insurer with more information on which to base an insurance decision, but the legislature nowhere required an IME or even a record review. If an insurer elects to deny coverage based on a procedure less complete than an IME, the insurer's record on any challenge to its denial may be more vulnerable than it would have been with an IME. An appeal of an insured's denial of benefits may then be successful, but that is a risk the legislature left the insurer free to take. Nothing in the legislative history indicates otherwise.

*Id.* at 1164–65 (citations omitted).

The District Court explained that it respectfully disagreed with the holding of the circuit court in its July 25, 2005 order in *Sakoda v. AIG Hawaii Insurance Co.,* Civil No. 04–1–0436. *Engle,* 402 F.Supp.2d at 1161. In *Sakoda,* the circuit court held that a record review was an IME under state law and explained:

If a party chooses to do a records [sic] review only and not conduct a physical examination, that is their choice. However, that does not mean that they do not have to meet the requirements of HRS § 431:10C–308.5(b).

To hold otherwise would undermine the "reason and spirit of the law"—to insure a fair process of review for both sides involved by selecting a neutral, unbiased examiner with an adequate amount of knowledge.

. . . .

. . . The legislature explained the reason for its amendment [in 2000, to HRS § 431:10C–308.5] in Conference Committee Report No. 37 on House Bill 2476:

*Your Committee has amended this measure to establish a fair selection process that favors selection by agreement.* Where the parties are unable to agree, a neutral forum (Department of Commerce and Consumer Affairs, arbitration, or circuit court) will make the selection. *It is emphasized that the se-*

*lection should not be a perfunctory matter, but that every effort should be made to select a neutral examiner with a balance [sic] approach that favors neither insurer or [sic] claimant. Those examiners who have acquired reputations for favoring one side or the other should not be selected.* Examiners who are primarily treating doctors who are familiar with community treatment protocols, injury patterns and cultural factors, that do not rely heavily on IME income that may affect bias, are to be favored. [Emphasis added.]

The legislative history clearly states the legislature's intent—to create a fair and impartial process that favors selection by agreement.

(Some bracketed material in original and some added.)

Nevertheless, in disagreeing with the circuit court's holding in *Sakoda,* the District Court explained that it was following clear statutory language in HRS § 431:10C–308.5(b), as well as the legislative intent. *Engle,* 402 F.Supp.2d at 1165–66.

In the instant case, in its Amended Partial Judgment, the circuit court determined that the holding in *Engle* was wrong and the holding in *Sakoda* was correct. We disagree.

HRS § 431:10C–308.5(b) is part of Article 10C, entitled "Motor Vehicle Insurance." Article 10C does not include a definition for "independent medical examiner" or IME, *see* HRS § 431:10C–103 (2005 Repl.), and we can find no case law or statutory provision in this jurisdiction defining or further describing either term.

Although we are not bound by the District Court's holding in *Engle,* we adopt its reasoning and conclude that GEICO did not violate HRS § 431:10C–308.5(b) in the instant case.

### IV.

The Amended Partial Judgment filed on July 17, 2006 in the Circuit Court of the First

Circuit is vacated and this case is remanded for further proceedings.

