194 P.3d 1071

Margret GILLAN and Howard Keller, M.D., Plaintiffs–Appellees–Petitioners,

v.

GOVERNMENT EMPLOYEES INSUR-ANCE COMPANY, Defendant–Appellant–Respondent,

and

John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Roe Non–Profit Corporations 1–10; and Roe Governmental Entities 1–10, Defendants.

No. 28075.

Supreme Court of Hawai'i.

Oct. 29, 2008.

Roy K.S. Chang, Honolulu (Harvey M. Demetrakopoulos on the briefs), for the plaintiffs-appellees-petitioners Margret Gillan and Howard Keller, M.D.

Kathy K. Higham, Honolulu, for the defendant-appellant-petitioner Government Employees Insurance Company.

J.P. Schmidt, Insurance Commissioner (Mark J. Bennett, Attorney General, David A. Webber, Deputy Attorney General (DAG), and Deborah Day Emerson, DAG, on the briefs), for the amicus curiae State of Hawai'i.

Katharine M. Nohr, Honolulu, on the briefs, for the amicus curiae Hawaii Insurers Council.

MOON, C.J., LEVINSON, NAKAYAMA, JJ., Circuit Judge LEE, in Place of DUFFY, J., Recused; and ACOBA, J., Concurring Separately.

Opinion of the Court by LEVINSON, J.

We accepted the application for a writ of certiorari filed by the plaintiffs-appellees-petitioners, a personal injury protection (PIP) claimant, Margret Gillan, and her treating

physician, Howard Keller, M.D. (collectively, the Plaintiffs), on June 23, 2008 to review the published opinion of the Intermediate Court of Appeals (ICA) in *Gillan v. Government Employees Insurance Co.*, 117 Hawai'i 465, 477, 184 P.3d 780, 792 (App.2008), which vacated the July 17, 2006 amended partial judgment of the first circuit court, the Honorable Sabrina S. McKenna presiding, in favor of the Plaintiffs and against the defendant-appellee-respondent Government Employees Insurance Company (GEICO). The circuit court concluded that GEICO violated the plain language of Hawai'i Revised Statutes (HRS) § 431:10C–308.5(b) (Supp.2002),[1] because the insurer failed to seek Gillan's consent when it retained a doctor to conduct an "independent medical examination" to determine whether her treatment from Dr. Keller was appropriate, reasonable, and necessarily incurred as a result of her automobile accident, *see* HRS § 431:10C–103.5(a) (Supp. 2002).[2] The ICA held to the contrary on the basis that GEICO's doctor did not, in fact, perform an independent medical examination in light of the statute's "clear" language, because, although he reviewed Gillan's medical records, he did not actually examine her, physically or otherwise. *See Gillan*, 117 Hawai'i at 475–77, 184 P.3d at 790–92. The Plaintiffs argue that the ICA erred in that regard.

Although we depart from the ICA's textual analysis of HRS § 431:10C–308(b), we ultimately arrive at the same conclusion that an actual examination, physical or otherwise, is an essential component of an "independent medical examination" within the meaning of the statute. Thus, the record review performed by the physician retained by GEICO did not constitute an independent medical examination, and, as such, GEICO did not violate the statute when it declined to seek Gillan's consent before hiring the doctor. We affirm the May 7, 2008 judgment of the ICA accordingly.

## I. BACKGROUND

### A. Factual Background

On December 15, 2002, Gillan was riding in the passenger seat of a Nissan truck owned and operated by her boyfriend, Frank Rainey, when the truck was struck from behind by another vehicle, which caused her to suffer injuries that required medical attention. The truck was covered by an automobile insurance policy issued by GEICO that was in full force and effect at the time of the collision. GEICO does not dispute that, as a passenger of the insured motor vehicle at the time of the collision, Gillan was and is entitled to PIP insurance coverage and benefits under Rainey's insurance policy and HRS

---

1. HRS § 431:10C–308.5, entitled "Limitation on charges," provides in relevant part:
    (b) The charges and frequency of treatment for services specified in [HRS § ]431:10C–103.5(a), except for emergency services provided within seventy-two hours following a motor vehicle accident resulting in injury, shall not exceed the charges and frequency of treatment permissible under the workers' compensation supplemental medical fee schedule. Charges for independent medical examinations, including record reviews, physical examinations, history taking, and reports, to be conducted by a licensed Hawaii provider unless the insured consents to an out-of-state provider, shall not exceed charges permissible under the appropriate codes in the workers' compensation supplemental medical fee schedule. The workers' compensation supplemental medical fee schedule shall not apply to independent medical examinations conducted by out-of-state providers if the charges for the examination are reasonable. The independent medical examiner shall be selected by mutual agreement between the insurer and claimant; provided

that if no agreement is reached, the selection may be submitted to the commissioner, arbitration or circuit court. The independent medical examiner shall be of the same specialty as the provider whose treatment is being reviewed, unless otherwise agreed by the insurer and claimant.
    The statute was subsequently amended in respects immaterial to the present matter. *See* 2006 Haw. Sess. L. Act 198, §§ 2 and 4 at 840–41.

2. HRS § 431:10C–103.5, entitled "Personal injury benefits; defined; limits," provided in relevant part: "(a) Personal injury protection benefits, with respect to any accidental harm, means all appropriate and reasonable treatment and expenses necessarily incurred as a result of the accidental harm and which are substantially comparable to the requirements for prepaid health care plans...." The statute was subsequently amended in respects immaterial to the present matter. *See* 2004 Haw. Sess. L. Act 56, §§ 1 and 4 at 285–86.

§ 431:10C–303(a) (Supp.2002).[3] In fact, GEICO initially wrote Gillan a letter notifying her that she was entitled to PIP benefits. GEICO also transmitted a PIP application form, which she completed and returned to GEICO. Gillan received medical treatment from various health care providers, including Dr. Keller, through September 2003. Bills for the treatment were submitted to GEICO for payment under the PIP benefits provided by the insurance policy and as required under Hawaii's no-fault law.

In deciding whether to deny a PIP claim, GEICO's in-house staff, which is comprised of bill reviewers, adjusters, and nursing personnel, routinely perform record reviews, including evaluations of the claimant's medical treatment records. Through these reviews, GEICO assesses whether the benefit claimed has actually been prescribed by a physician, whether the allowed number of visits has been exceeded, whether the statute of limitations has lapsed, whether workers' compensation provides primary coverage, as well as whether the claimant has presented reasonable proof of the claim for benefits. In some cases, GEICO may request that a physician review records without examining the claimant to determine whether, from the physician's perspective, the claim is for treatment that was appropriate, reasonable, and necessarily incurred as a result of accidental harm sustained in a motor vehicle accident.

GEICO followed that procedure in response to certain claims Gillan made for PIP benefits. GEICO retained Bruce Hector, M.D., who was a physician licensed by the State of Hawai'i, a fellow of the American Back Society, and a certified independent medical evaluator. The doctor never saw or examined Gillan or consulted with her health care providers, but merely reviewed her medical records to determine whether she required medical treatment and care as a result of the injuries she sustained in the December 15, 2002 collision. In his report dated December 8, 2003, Dr. Hector opined that Gillan did not require medical care and

treatment as a result of the collision once she had completed her first six physical therapy sessions. Relying on Dr. Hector's report, GEICO sent Gillan various denial of claim forms, the first of which was dated March 11, 2004. GEICO maintained that, pursuant to HRS § 431:10C–103.5(a), Gillan was not entitled to benefits for two of her visits with Dr. Keller and for magnetic resonance imaging services, because those services were not appropriate, reasonable, or necessary. GEICO also advised Gillan that, if she wished to contest its denial, she could bring an action in court.

### B. *Circuit Court Proceedings*

The Plaintiffs filed a complaint against GEICO in circuit court on April 15, 2005, alleging that GEICO had hired an independent medical examiner, Dr. Hector, without first seeking Gillan's consent, in violation of HRS § 431:10C–308.5. On September 8, 2005, they moved for partial summary judgment on this claim, arguing, among other things, that, because GEICO had violated the statute, the circuit court should rule that GEICO's denials of Gillan's claims for benefits and Dr. Keller's bills were improper, null, and void. The Plaintiffs observed that, under the statute, an insurer must seek to obtain a PIP claimant's agreement in selecting an "independent medical examiner." Relying on a circuit court ruling by the Honorable Bert I. Ayabe in *Sadoka v. AIG Hawaii,* Civ. No. 04–1–0436–03 (Haw.Cir.Ct. July 25, 2005), the Plaintiffs asserted that Dr. Hector was an independent medical examiner under the plain language of HRS § 431:10C–308.5(b), because he performed a record review and because a record review is part of an independent medical examination. The Plaintiffs also cited the legislative history of HRS § 431:10C–308.5 to support their interpretation of the statute. Finally, they made the preemptive charge that, although the United States District Court for the District of Hawaii and the Insurance Commissioner

---

**3.** HRS § 431:10C–303, entitled "Right to personal injury protection benefits," provides in relevant part: "(a) If the accident causing accidental harm occurs in this State, every person insured under this article, and such person's survivors,

suffering loss from accidental harm arising out of the operation, maintenance, or use of a motor vehicle, has a right to personal injury protection benefits."

of the State of Hawai'i had reached the opposite conclusion in *Engle v. Liberty Mutual Fire Insurance Co.*, 402 F.Supp.2d 1157 (D.Haw.2005), and *Weigel v. Liberty Mutual Fire Insurance Co.*, ATX–2002–134–P (Hawai'i Insurance Commissioner's Final Order Mar. 31, 2005), *available at* http://hawaii.gov/dcca/areas/oah/oah_decisions/INS/no–fault/ATX–2002–134–P Weigel v Liberty.pdf (last visited Oct. 17, 2008), those decisions were unpersuasive, because their analyses were inconsistent with the statutory language and legislative intent. GEICO countered that Dr. Hector was not an independent medical examiner, because he had not actually examined Gillan in preparing his report. GEICO's position was premised on the statute's plain language, its legislative history, *Engle*, and *Weigel*.

The circuit court heard the motion on October 11, 2005. At the hearing, the circuit court expressed its hope "that both the consumer lawyers, as well as the insurance industry, [would] go[ ] back to the legislature because ... clarification would be helpful [with respect to the meaning of the term 'independent medical examination']."[4] After hearing the parties' arguments, the circuit court took the matter under advisement and, on October 20, 2005, the circuit court entered its order partially granting the motion. The circuit court concluded that GEICO was required by HRS § 431:10C–308.5 to seek Gillan's consent before hiring Dr. Hector and that GEICO had failed to meet that obligation. Consequently, pursuant to *TIG Insurance Co. v. Kauhane*, 101 Hawai'i 311, 67 P.3d 810 (App.2003), the circuit court prohibited GEICO from relying on Dr. Hector's report as a basis for its denial of PIP benefits to Gillan for treatment rendered by Dr. Keller. Still, the circuit court denied the Plaintiff's motion to the extent that it sought a ruling that GEICO's denials were improper, null, and void, because the Plaintiffs had failed to carry their burden of proof.

On November 21, 2005, GEICO filed a Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) motion for certification, seeking

an order directing the entry of a final judgment in favor of the Plaintiffs and against GEICO based upon the circuit court's order partially granting the Plaintiff's motion for partial summary judgment. The Plaintiffs joined GEICO's motion on November 22, 2005, and the circuit court granted the motion on January 19, 2006. GEICO filed a notice of appeal on February 21, 2006. The circuit court entered its partial judgment on February 27, 2006, and GEICO filed an amended notice of appeal the next day. This court dismissed GEICO's appeal on May 25, 2006, because the circuit court's judgment did not contain the requisite language for HRCP Rule 54(b) certification. The circuit court entered an amended order granting GEICO's motion for certification on June 10, 2006 and an amended partial judgment on July 17, 2006. On August 2, 2006, GEICO filed a second amended notice of appeal.

### C. *Appellate Proceedings*

In its points of error on appeal, GEICO argued that the circuit court had stretched HRS § 431:10C–308.5(b) beyond its plain meaning by concluding that the statute applied whenever an insurer sought any expert medical opinion to inform a decision as to whether to make a PIP payment. GEICO also asserted that the circuit court erred in ruling that GEICO had violated HRS § 431:10C–308.5(b) by obtaining and relying upon a record review as a part of its PIP claim review and payment decision without agreement from Gillan regarding the selection of the reviewing doctor. Finally, GEICO maintained that the circuit court erred in ruling that GEICO was prohibited at trial from relying on Dr. Hector's report as a basis for its denial of PIP benefits to Gillan for treatment rendered by Dr. Keller. *Amicus* briefs were filed in support of GEICO's position by the insurance commissioner and by Hawaii Insurers Council.

Adopting the federal district court's reasoning in *Engle*, the ICA concluded that GEICO did not violate HRS § 431:10C–308.5(b), because the statute's "clear" lan-

---

4. We endorse the circuit court's aspiration because, as explained *infra* in section III.A, we believe that HRS § 431:10C–308.5(b) is ambigu-

ous as to whether an "independent medical examination" requires some form of actual examination, physical or otherwise.

guage and legislative history did not require that GEICO seek Gillan's consent before retaining Dr. Hector to perform a record review. *Gillan,* 117 Hawai'i at 474–77, 184 P.3d at 789–92. As such, the ICA vacated the circuit court's amended partial judgment. *Id.* at 477, 184 P.3d at 792. The ICA entered its judgment on appeal on May 7, 2008, and the Plaintiffs filed their timely application for a writ of certiorari on May 15, 2008. *See* Hawai'i Rules of Appellate Procedure Rule 40.1(a). We accepted the application on June 23, 2008 and heard oral argument on August 21, 2008.

## II.  STANDARDS OF REVIEW

### A.  Motion For Summary Judgment

■ This court reviews the circuit court's grant of summary judgment *de novo.* *Price v. AIG Hawai'i Ins. Co.,* 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." HRCP Rule 56(c).

### B.  Statutory Interpretation

■ This court generally reviews questions of statutory interpretation *de novo,* '*Olelo v. Office of Info. Practices,* 116 Hawai'i 337, 344, 173 P.3d 484, 491 (2007), but, "[i]n the case of ... ambiguous statutory language, the applicable standard of review regarding an agency's interpretation of its own governing statute requires this court to defer to the agency's expertise and to follow the agency's construction of the statute unless that construction is palpably erroneous," *Vail v. Employees' Ret. Sys.,* 75 Haw. 42, 66, 856 P.2d 1227, 1240 (1993).

## III.  DISCUSSION

The Plaintiffs' basic argument is that the ICA erred in concluding that GEICO did not violate HRS § 431:10C–308.5(b) in denying

**5.** HRS § 431:10C–304(3)(B) sets forth some of the procedures that insurers must follow in deny-

her claim for PIP benefits. PIP benefits, "with respect to any accidental harm," are "all appropriate and reasonable treatment and expenses necessarily incurred as a result of the accidental harm and which are substantially comparable to the requirements for prepaid health care plans." HRS § 431:10C–103.5(a). In deciding whether to deny a PIP claim, *see* HRS § 431:10C–304(3)(B) (Supp. 2002),[5] HRS § 431:10C–308.5(b) permits an insurer to utilize an "independent medical examination" in order to review the claimant's treatment from his health care provider. If an insurer elects to employ an independent medical examiner to assess whether the claimant's treatment is appropriate, reasonable, and necessarily incurred as a result of the accidental harm, *see* HRS § 431:10C–103.5(a), HRS § 431:10C–308.5(b) requires that the examiner "be selected by mutual agreement between the insurer and claimant," but also provides the exception that, "if no agreement is reached, the selection may be submitted to the commissioner, arbitration or circuit court."

In this case, GEICO did not seek Gillan's consent in hiring Dr. Hector to assess the appropriateness of her medical treatment. Dr. Hector looked only to her medical records; he did not actually examine her, physically or otherwise. By its terms, HRS § 431:10C–308.5(b) contemplates that certain activities may be associated with an independent medical examination, including "record reviews, physical examinations, history taking, and reports." The Plaintiffs maintain that, in light of the statute's plain language, Dr. Hector's record review was itself an independent medical examination and that GEICO therefore breached its obligation under the statute to seek Gillan's consent. On the other hand, GEICO, supported by the insurance commissioner and the Hawai'i Insurers Council, asserts that it had no statutory duty to seek Gillan's agreement in selecting Dr. Hector, because, without an actual "examination," the doctor's review of her records did not rise to the level of an "independent medical examination." The fundamental question

ing PIP claims.

is therefore whether, absent an actual examination, physical or otherwise, Dr. Hector's record review constitutes an "independent medical examination" within the meaning of HRS § 431:10C–308.5(b).

A. *The Term "Independent Medical Examination," As It Appears In HRS § 431:10C–308.5(b), Is Ambiguous With Respect To Whether An Actual Examination Of The Claimant, Physically Or Otherwise, Is An Essential Aspect Of The "Examination."*

■ In interpreting the statute, this court's " 'foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.' " *Colony Surf, Ltd. v. Dir. of the Dep't of Planning & Permitting*, 116 Hawai'i 510, 516, 174 P.3d 349, 355 (2007) (quoting *Gray v. Admin. Dir. of the Court*, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997)). The Plaintiffs argue that two of the statute's provisions, the first of which employs the word "reviewed" and the second of which contains the term "records," demonstrate that the legislature intended for an "independent medical examination" to encompass the situation in which only the claimant's medical records are reviewed, but the claimant is not physically examined. The first provision specifically states that "[t]he independent medical examiner shall be of the same specialty as the provider whose treatment is being reviewed." HRS § 431:10C–308.5(b). Aside from mandating that the examiner have the same specialty as the treating health care provider, the sentence demonstrates that the core function of the examination is to evaluate the propriety of the claimant's treatment by his health care provider. *See id.* While the sentence sheds light on the purpose of an independent medical examination, it does not speak to the process by which the examination takes place; it does not address whether an actual "examination" is the essence of that process. The second provision that the Plaintiffs cite directs that "[a]ll records and charges relating to an independent medical examination shall be made available to the claimant upon request." *Id.* This provision serves to illustrate that the review of records

may be related to an independent medical examination. *See id.* Still, the question is not whether a record review is merely "*relat[ed]* to an independent medical examination," *see id.* (emphasis added), but, rather, whether a record review is *itself* an independent medical examination. Thus, the second provision, like the first, does not answer the question at hand because it does not imply, much less direct, that an actual examination is or is not an essential component in an independent medical examination. In summary, although the language of HRS § 431:10C–308.5(b) plainly establishes that an independent medical examination *may* involve both a record review and a physical examination, the Plaintiffs have not cited, and we have not found, a provision in the statute, or in any other section of the motor vehicle insurance law, HRS ch. 431:10C, that squarely addresses whether an actual examination is an essential element of an "independent medical examination."

■ Because the term is not statutorily defined, this court " 'may resort to legal or other well accepted dictionaries as one way to determine [its] ordinary meaning.' " *Leslie v. Bd. of Appeals of the County of Hawai'i*, 109 Hawai'i 384, 393, 126 P.3d 1071, 1080 (2006) (quoting *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 424, 32 P.3d 52, 68 (2001)). As the Plaintiffs point out, *Black's Law Dictionary* broadly defines "independent medical examination" as "[a]n assessment of a person's physical condition and health that is made by an impartial healthcare professional, usu[ally] a physician." *Black's Law Dictionary* 785 (8th ed.2004). A person's physical condition and health could certainly be assessed simply by reviewing his medical records and without examining him physically. Thus, as defined by *Black's Law Dictionary*, Dr. Hector's review of Gillan's records could fairly be characterized as an independent medical examination.

On the other hand, certain medical dictionaries suggest that an "examination" involves some form of actual in-person contact. *Taber's Cyclopedic Medical Dictionary* defines an "examination" as "[t]he act or process of inspecting the body and its systems to deter-

mine the presence or absence of disease." *Taber's Cyclopedic Medical Dictionary* 682 (18th ed.1997). The dictionary further states that the word is generally prefaced by terms indicating the type of examination, such as "physical, bimanual, digital, oral, rectal, obstetrical, roentgenological, [or] cystoscopic." *Id. Dorland's Illustrated Medical Dictionary* similarly defines "examination" as "inspection, palpation, ausculation, percussion, or other means of investigation, especially for diagnosing disease, qualified according to the methods employed, as physical examination, radiological examination, diagnostic imaging examination, or cystoscopic examination." *Dorland's Illustrated Medical Dictionary* 651 (30th ed.2003); *accord Sloane–Dorland Annotated Medical–Legal Dictionary* 270 (1987); *PDR Medical Dictionary* 628 (2d ed.2000). Thus, these medical dictionaries counsel that an actual "examination" is an indispensable part of a medical examination.

■ In addition to dictionaries, this court may also consult legal treatises to ascertain the meaning of a term that is not defined by statute. *See Allstate Ins. Co. v. Kaneshiro*, 93 Hawai'i 210, 215, 998 P.2d 490, 495 (2000) (relying on *Couch on Insurance* in defining the term "renewal policy" in HRS § 431:10C–301 (1993), because the term was not defined in Hawaii's motor vehicle insurance law, HRS ch. 431:10C). Like the medical dictionaries, *Couch on Insurance* indicates that an independent medical examination necessarily involves an actual examination. The treatise states that, "[i]n the process of investigating a personal injury or disability claim ..., an insurer is entitled to obtain medical records pursuant to the claimant's authorization and to request a physical examination of the claimant, commonly known as an independent medical examination or IME." 13 *Couch on Insurance* § 196:53, at 196–60 (3d ed.1995); *see also id.* § 196:67, at 196–72 (similarly equating an independent medical examination with a physical examination). The treatise also teaches that, because the scope of the independent medical examination is guided by the medical condition claimed by the insured, the insurer may be required to conduct a medical record review in advance of seeking an independent medical examina-

tion. *Id.* § 196:67, at 196–72. Hence, *Couch on Insurance* seems to suggest that an independent medical examination necessarily involves an actual examination of the claimant, physically or otherwise, and that the "examination" is distinct from a mere record review, which precedes the examination. *See id.* §§ 196:53, 196:67, at 196–60, 196–72.

Another textual guide that this court has utilized in interpreting statutory terms is common usage. *See Bishop Trust Co. v. Burns*, 46 Haw. 375, 399, 381 P.2d 687, 701 (1963) ("Courts will presume that the words in a statute were used to express their meaning in common usage."); *see also Sherman v. Sawyer*, 63 Haw. 55, 59, 621 P.2d 346, 349 (1980) (interpreting the statutory phrase "exclusive jurisdiction" according to its "general and common usage"). In reviewing the proceedings at trial in *Nelson v. University of Hawai'i*, we explained that the defendants had relied upon the testimony of "a psychiatrist who had conducted an independent medical examination ... of [the plaintiff] in March 1997 and had reviewed her medical history." 97 Hawai'i 376, 383, 38 P.3d 95, 102 (2001). Our use of the conjunctive "and" implies that we regarded an independent medical examination as being distinct from a medical history review. *See id.* We later observed that the psychiatrist had conducted a two-hour interview of the plaintiff. *Id.* at 386, 38 P.3d at 105. Thus, what appears to have distinguished the independent medical examination from the medical history review was that the former involved an actual examination of the plaintiff, whereas the latter did not. *See id.* at 383, 386, 38 P.3d at 102, 105. The manner in which we employed the term "independent medical examination" in *Nelson* is consistent with the notion that an actual examination of the claimant is an essential aspect of an independent medical examination.

Courts across the country appear to have a similar understanding of the term. *See Engle*, 402 F.Supp.2d at 1162 ("Courts routinely use the term 'IME' to describe procedures in which in-person examinations were conduct-

ed.");[6] *Doss v. Manfredi*, 30 Kan.App.2d 269, 40 P.3d 333, 334–35 (2002) (explaining that a doctor retained by an insurer to review the PIP claimant's chiropractic treatment "only reviewed the chiropractic records relating to the treatment of [the claimant] without any IME"); *Glover v. Jefferson Pilot Fin. Ins. Co.*, No. 4:06–CV323 GTE, 2007 WL 552114, *10, 2007 U.S. Dist. LEXIS 12079, at *17, *28 (E.D.Ark. Feb. 21, 2007) (observing that, in response to a claim for long-term disability benefits, an insurer sent the claimant's file to a doctor who "did not conduct an independent medical examination on the [claimant]," but who instead "only reviewed records"); *O'Connell v. Unum Provident*, Civ. No. 04–3499, 2006 WL 288080, *14, 2006 U.S. Dist. LEXIS 4826, at *25–*27, *42 (D.N.J. Feb. 3, 2006) (noting that, although a disability insurer's experts reviewed the claimant's medical records, the "experts did not examine the [claimant]," and that the insurer's "failure to conduct an independent medical examination is not itself sufficient grounds to reverse a determination"); *United Founders Life Ins. Co. v. Carey*, 363 S.W.2d 236, 242 (Tex.1962) ("A medical *examination* imports a *physical examination* as distinguished from a medical history *investigation*." (emphases in original)).

Yet, at the same time, other courts have characterized a doctor's evaluation as an independent medical examination, even where the physician never physically examined the claimant. *See Nickel v. Unum Life Ins. Co. of Am.*, No. 06–10476–BC, 582 F.Supp.2d 869, 879, 2008 WL 2048702, *11, 2008 U.S. Dist. LEXIS 16777, at *26–*28 (E.D.Mich. Mar. 3, 2008) (explaining that a disability insurer's physician performed an independent medical examination of the claimant even though the doctor "never examined [the claimant] in person," but, instead, only "reviewed [the claimant's] records"); *Johnson v. Park N Shop*, 446 S.W.2d 182, 187–88 (Mo. Ct.App.1969) (holding that a doctor who reviewed the workers' compensation claimant's medical records and prepared a report, but who did not physically examine the claimant,

was an "examining physician," such that the report was subject to a statute requiring disclosure of medical reports prepared by examining physicians, because the only difference between a physician who conducted a physical examination and the doctor who simply reviewed records was the claimant's presence in the doctor's office).

In light of these conflicting interpretations of the term "independent medical examination," we do not agree with the ICA, the circuit court, the parties, or the *amici curiae* that the meaning of the term, as it appears in HRS § 431:10C–308.5(b), is "plain" or "clear" with respect to the necessity of an actual examination. *See Gillan*, 117 Hawai'i at 477, 184 P.3d at 792. " 'When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. Put differently, a statute is ambiguous if it is capable of being understood by reasonably well-informed people in two or more different senses.' " *Farmer v. Administrative Dir. of the Court*, 94 Hawai'i 232, 236, 11 P.3d 457, 461 (2000) (quoting *Konno v. County of Hawai'i*, 85 Hawai'i 61, 71, 937 P.2d 397, 407 (1997)). From our perspective, reasonable minds could differ as to whether an "independent medical examination" pursuant to HRS § 431:10C–308.5(b) requires some form of actual examination, and, as such, we hold that the term is ambiguous. *See id.; see also Mehau v. Reed*, 76 Hawai'i 101, 108–09, 869 P.2d 1320, 1327–28 (1994) (concluding that the word "court" in HRS § 93E–11(c) (1985) was ambiguous because it could be interpreted as meaning either "judge" or "jury").

B. *Because The Term "Independent Medical Examination" In HRS § 431:10C–308.5(b) Is Ambiguous, This Court Defers To The Insurance Commissioner's Interpretation, Unless His Interpretation Is Palpably Erroneous.*

"In the case of . . . ambiguous statutory language, the applicable standard of re-

---

**6.** Contrary to the impression expressed in the concurring opinion, we do not cite *Engle* for the proposition that HRCP Rule 35 and Federal Rules of Civil Procedure Rule 35 are in fact instructive in determining whether a record review alone constitutes an "independent medical examination" under HRS § 431:1–308.5. *See* concurring opinion at 131, 194 P.3d at 1093. We merely cite the *Engle* decision as illustrative of how courts have generally employed the term.

view regarding an agency's interpretation of its own governing statute requires this court to defer to the agency's expertise and to follow the agency's construction of the statute unless that construction is palpably erroneous." *Vail,* 75 Haw. at 66, 856 P.2d at 1240; *see also Morgan v. Planning Dep't,* 104 Hawai'i 173, 180, 86 P.3d 982, 989 (2004). "Such deference 'reflects a sensitivity to the proper roles of the political and judicial branches,' insofar as 'the resolution of ambiguity in a statutory text is often more a question of policy than law.'" *In re Water Use Permit Applications,* 94 Hawai'i 97, 145, 9 P.3d 409, 457 (2000) (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 696, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)). In the present matter, the insurance commissioner correctly observes that he was entrusted with enforcing the insurance code in general, *see* HRS § 431:2–201(b), and with reviewing the propriety of denials of PIP claims in particular, *see* HRS §§ 431:2–102(b) and 431:10C–212.

He reviewed one such claim in *Weigel,* wherein a medical provider asserted that an insurer's denials were improperly based upon medical records reviews performed by an independent medical examiner who only reviewed the claimants' medical records and who was not selected by mutual agreement between the insurer and the claimants, in contravention of HRS § 431:10C–308.5(b). ATX–2002–134–P, hearings officer's findings of fact, conclusions of law, and recommended order (RO) at 2, 4–7. In the hearings officer's recommendation to the commissioner, he concluded that, although the statute did not define "independent medical examination," the term necessarily "includes a physical examination, which requires doctor-patient interaction." *Id.* at 9. According to the hearings officer, the statute requires that an insurer seek a claimant's consent in light of the potentially invasive nature of that physical interaction. *Id.* The insurance commissioner adopted the hearings officer's recommendation, *id.,* commissioner's final order (CFO) at 2, specifically ruling that "the conditions placed on the … selection of a provider of an [i]ndependent [m]edical [e]xami-nation do[ ] not apply to a medical records reviewer whose activities do not require a medical providers' license," *id.* at 2 n. 1. According to the commissioner, the insurer's "decision to employ a medical professional to provide consultation in support of, or to perform the duties typically undertaken by[,] adjusters and bill reviewers does not subject the [insurer] to compliance with the obligations associated with performing an [i]ndependent [m]edical [e]xamination." *Id.*

Because the insurance commissioner has been charged with reviewing PIP benefit denials, *see* HRS §§ 431:2–102(b) and 431:10C–212, and because, in the course of reviewing such denials in *Weigel,* he specifically ruled that a record review without a physical examination did not qualify as "an independent medical examination" within the meaning of HRS § 431:10C–308.5(b), *see* ATX–2002–134–P, RO at 9, CFO at 2 n. 1, we believe that his ruling is entitled to deference, unless it is palpably erroneous. *See Vail,* 75 Haw. at 65–66, 856 P.2d at 1239–40 (deferring to the employees' retirement system's interpretation of the term "part-time employees" in HRS § 88–43, as evidenced by its arguments on appeal and its implementation of the statute through an administrative rule, because the statutory term was ambiguous); *Holi v. AIG Haw. Ins. Co.,* 113 Hawai'i 196, 205–06, 150 P.3d 845, 854–55 (App.2007) (according deference to the insurance commissioner's interpretation of the word "relative," appearing in HRS § 431:10C–103, which was not defined by statute, because the meaning of the word was less than clear and because the commissioner had promulgated a rule defining the term for purposes of administering the Hawai'i motor vehicle insurance law, HRS ch. 431:10C); *Treloar v. Swinerton & Walberg Co.,* 65 Haw. 415, 421, 424–26, 653 P.2d 420, 424, 426–27 (1982) (deferring to the department of labor and industrial relations' construction of an ambiguous provision in HRS § 386–54, which the department enunciated in an administrative ruling, because the department was charged with carrying out the workers' compensation law, HRS ch. 386).

C. *The Insurance Commissioner's Interpretation That An Actual Examination Is A Necessary Component Of An "Independent Medical Examination" Under HRS § 431:10C–308.5(b) Is Not Palpably Erroneous.*

The Plaintiffs essentially assert that, in light of the statute's legislative history, the insurance commissioner's understanding of the term "independent medical examination" in HRS § 431:10C–308.5(b) is palpably erroneous. An agency's interpretation of a statute is palpably erroneous when it is inconsistent with the legislative intent underlying the statute. *Cf. Treloar,* 65 Haw. at 425–26, 653 P.2d at 427 (holding that an agency's interpretation of a workers' compensation statute was not palpably erroneous because it was consonant with the legislative intent underlying the statute). In construing an ambiguous statute, this court " 'may resort to extrinsic aids in determining legislative intent,' " one of which is " 'legislative history.' " *Hawaii Home Infusion Assocs. v. Befitel,* 114 Hawai'i 87, 91, 157 P.3d 526, 530 (2007) (quoting *Courbat v. Dahana Ranch, Inc.,* 111 Hawai'i 254, 261, 141 P.3d 427, 434 (2006)); *Silva v. City & County of Honolulu,* 115 Hawai'i 1, 6, 165 P.3d 247, 252 (2007). Thus, in the present matter, because the term "independent medical examination" as employed in HRS § 431:10C–308.5(b) is ambiguous, *see supra* section III.A, this court may consult the statute's legislative history to ascertain the meaning of the term. *See Haw. Home Infusion Assocs.,* 114 Hawai'i at 91, 157 P.3d at 530.

The Plaintiffs begin their analysis with the legislative history underlying the 1998 amendments to the statute. Prior to those amendments, HRS § 431:10C–308.5(b) provided in relevant part that "[c]harges for independent medical examinations to be conducted by a licensed Hawaii provider, unless the insured consents to an out-of-state provider, shall not exceed the charges permissible under the workers' compensation schedules for consultation for a complex medical problem." HRS § 431:10C–308.5(b) (Supp. 1997). The legislature amended this provision by adding the following underscored language: "Charges for independent medical

examinations, including record reviews, physical examinations, history taking, and reports, to be conducted by a licensed Hawaii provider unless the insured consents to an out-of-state provider, shall not exceed the charges permissible under the workers' compensation schedules for consultation for a complex medical problem." 1998 Haw. Sess. L. Act 275, § 26 at 935 (emphasis in original) (footnote omitted). The legislative history reflects that the amendment was specifically "designed to eliminate abuses and excessive charges associated with independent medical examinations (IMEs)" by "clarif[ying] that the workers' compensation fee schedule charge allowable for IMEs may not be exceeded by submitting a separate charge for the report or other ancillary procedures incident to the conducting of an IME." Hse. Conf. Comm. Rep. No. 117, in 1998 House Journal, at 1000; Sen. Conf. Comm. Rep. No. 117, in 1998 Senate Journal, at 794. The amendment also served, more generally, to decrease "automobile insurance rates for [the] driving public." Hse. Conf. Comm. Rep. No. 117, in 1998 House Journal, at 999; Sen. Conf. Comm. Rep. No. 117, in 1998 Senate Journal, at 793.

In effect, the Plaintiffs argue that interpreting "independent medical examination" to include record reviews without a physical examination would advance the legislature's goal of limiting insurance costs because, so construed, a record review would be subject to the workers' compensation fee schedule. *See* HRS § 431:10C–308.5(b). While it is true that the legislative history reflects that the amendment was aimed at containing the costs of activities associated with independent medical examinations, the committee reports do not suggest that the particular activity of reviewing medical records is, without more, an independent medical examination. *See Engle,* 402 F.Supp.2d at 1164. If anything, the legislative history militates in favor of the opposite conclusion insofar as it draws a distinction between an independent medical examination and a "report or other ancillary procedures incident to the conducting of an IME." Hse. Conf. Comm. Rep. No. 117, in 1998 House Journal, at 1000; Sen. Conf. Comm. Rep. No. 117, in 1998 Senate Journal, at 794; *see also Engle,* 402 F.Supp.2d at

1164. Although the committee reports do not specifically state that a record review is an ancillary procedure that is incident to an independent medical examination, we believe that the legislature probably viewed it as such, especially because record reviews are generally understood to be measures undertaken in preparation for independent medical examinations, *see* 13 *Couch on Insurance* § 196:67, at 196–72.

Aside from the 1998 amendment to the cost containment provision, the Plaintiffs draw attention to one of the sentences added in 2000, which directed that "[t]he independent medical examiner shall be selected by mutual agreement between insurer and claimant; provided that if no agreement is reached, the selection may be submitted to the commissioner, arbitration or circuit court." 2000 Haw. Sess. L. Act, 138 § 2 at 270 (emphasis omitted). The committee reports indicate that this provision was intended "to establish a fair selection process that favors selection by agreement." Sen. Conf. Com. Rep. No. 37, in 2000 Senate Journal, at 742; Hse. Conf. Com. Rep. No. 37, in 2000 House Journal, at 865. The legislature emphasized that "the selection should not be a perfunctory matter" and that "every effort should be made to select a neutral examiner with a balanced approach that favors neither insurer [n]or claimant." Sen. Conf. Com. Rep. No. 37, in 2000 Senate Journal, at 742; Hse. Conf. Com. Rep. No. 37, in 2000 House Journal, at 865. The legislature further indicated that "[t]hose examiners who have acquired reputations for favoring one side or the other should not be selected" and that "[e]xaminers who are primarily treating doctors who are familiar with community treatment protocols, injury patterns and cultural factors, that do not rely heavily on IME income that may affect bias, are to be favored." Sen. Conf. Com. Rep. No. 37, in 2000 Senate Journal, at 742; Hse. Conf. Com. Rep. No. 37, in 2000 House Journal, at 865.

The Plaintiffs contend that the term "independent medical examination" should be read to encompass record reviews, in the absence of a patient-contact examination, such that all medical experts who review records must be selected pursuant to the "mutual agreement" provision. *See* HRS § 431:10C–308.5(b). The Plaintiffs urge that their interpretation would effectuate the legislature's goal of ensuring that an independent medical examination is indeed "independent." While the committee reports relating to the 2000 amendments no doubt address what it means to be "independent," they simply do not speak to the contours of the "examination," particularly whether an actual examination of the claimant is required or whether a review of the claimant's records would suffice. *See* Sen. Conf. Com. Rep. No. 37, in 2000 Senate Journal, at 742; Hse. Conf. Com. Rep. No. 37, in 2000 House Journal, at 865. Simply put, the reports consider *who* performs the examination, but not *how* the examination is to be performed. *See* Sen. Conf. Com. Rep. No. 37, in 2000 Senate Journal, at 742; Hse. Conf. Com. Rep. No. 37, in 2000 House Journal, at 865.

Apart from the "mutual agreement" provision, the Plaintiffs highlight that, in the 2000 amendments, the legislature inserted the condition that "[t]he independent medical examiner shall be of the same specialty as the provider whose treatment is being reviewed, unless otherwise agreed by the insurer and claimant." 2000 Haw. Sess. L. Act, 138 § 2 at 270 (emphasis omitted). During the floor debates, Representative Ron Menor had this to say about the provision:

> Doctors representing the Hawai'i Medical Association who requested [the specialty provision] were concerned about the use of unqualified persons performing IME *reviews* of their work. I agreed to do so because I felt that the inclusion of this requirement made common sense. For example, it makes sense to require a neurosurgeon IME to *review* spinal surgery. Moreover, it would not make sense to allow an IME psychiatrist to *review* the treatment of a broken leg by an orthopedist. In addition, a person performing an IME *review* of a knee reconstruction by an orthopedic surgeon should have training in orthopedic surgery.

Comment by Representative Menor, in 2000 House Journal, at 710 (emphases added) (quotation marks omitted). Representative

Romy M. Cachola likewise spoke about the specialty provision, noting that:

Given as an example, is a case wherein a claimant with foot and spinal injuries, whose treatment *records* are to be *reviewed*, has undergone treatment by a podiatrist, physical therapist, chiropractor and orthopedic surgeon. In this example, the question to ask is, does the specialty provision ... mean that you have to require four IMEs with the same specialty to *review* treatment conducted by the podiatrist, physical therapist, chiropractor and orthopedic surgeon? I believe that if the provision of this bill is narrowly interpreted, then the answer is "yes."

However, if we acknowledge that there are clinical overlaps, and thus a medical specialist or multi-specialist is knowledgeable about a given clinical problem then the answer is "no"—there is no requirement for four IMEs.

It is for the aforementioned reasons that in the committee report, to clarify the specialty provision, that language is included to insure that IME doctors possess adequate knowledge necessary to properly *review* the treatment rendered by the treating medical provider.

Comment by Representative Cachola, in 2000 House Journal, at 711 (emphases added) (quotation marks omitted).

██ The Plaintiffs maintain that the statements by Representatives Menor and Cachola during the floor debates in connection with the specialty provision illustrate that a record review is an independent medical examination, because the representatives repeatedly asserted that an independent medical examination involves a "review" of the claimant's treatment "records." Although independent medical examinations often, if not usually, involve record reviews, from our perspective, the representatives' statements do not address whether a record review is, in and of itself, an independent medical examination. Moreover, " '[s]tray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted for the bill.' " *Wright v. Home Depot U.S.A., Inc.*, 111 Ha-

wai'i 401, 411 n. 8, 142 P.3d 265, 275 n. 8 (2006) (quoting *Bennett v. Yoshina*, 98 F.Supp.2d 1139, 1150 (D.Haw.2000), *aff'd*, 259 F.3d 1097 (9th Cir.2001)). As discussed earlier, the specialty provision does not, by its terms, unequivocally dictate that a record review is an independent medical examination. *See supra* section III.A. Looking past the statutory language, the committee reports reflect that the provision was intended to ensure "that IME doctors possess adequate knowledge necessary to properly evaluate the treatment rendered by the treating doctor or medical provider." Sen. Conf. Com. Rep. No. 37, in 2000 Senate Journal, at 742; Hse. Conf. Com. Rep. No. 37, in 2000 House Journal, at 865. Like the statutory language, the committee reports are silent with respect to whether a record review alone is an independent medical examination. Therefore, even assuming, *arguendo*, that the comments of Representatives Menor and Cachola could be read to suggest that a record review is, without more, an independent medical examination, those comments could not be imputed to the full legislature that voted for the bill because they would not be supported by the statutory language or committee reports. *See Wright*, 111 Hawai'i at 411 n. 8, 142 P.3d at 275 n. 8.

The Plaintiffs also analogize the independent medical examination process to the peer review organization system prescribed in HRS § 431:10C–308.6 (1993), which was repealed in 1998 because it was too expensive and time-consuming. *See* 1997 Haw. Sess. L. Act 251, §§ 59 and 70 at 551, 553; Hse. Stand. Com. Rep. No. 250, in 1997 House Journal, at 1211. Under the peer review system, if a PIP insurer wanted to dispute the appropriateness of certain treatments or charges, it had to initially request a peer review. *See* HRS §§ 431:10C–308.6(a) (1993) and 431:10C–308.5(c) and (d) (1993). A peer review was conducted by an organization that was approved by the insurance commissioner. HRS § 431:10C–308.6(b). Additionally, the organization was required to designate an individual who practiced the same specialty as the claimant's treating health care provider. *Id.* The Plaintiffs point out that the independent medical examination process is

similar to the peer review system to the extent that the examiner must be "independent," insofar as he is selected by agreement or tribunal and of the same specialty as the provider whose treatment is being reviewed. *See* HRS §§ 431:10C–308.5(b) (Supp.2002) and 431:10C–308.6(b). The Plaintiffs appear to assert that, just as the legislature regulated record reviews in the peer review system, so too did it intend to regulate record reviews through independent medical examinations. The Plaintiffs' argument begs the question of what it means to be "examined," because, unlike the peer review system, the independent medical examination process clearly contemplates an "examination." HRS § 431:10C–308.5(b). Thus, we believe that the Plaintiffs' analogy to the repealed peer review system ultimately breaks down.

Beyond citing legislative history, the Plaintiffs attempt to demonstrate legislative intent by invoking the cannon of construction that " 'the legislature is presumed not to intend an absurd result.' " *Colony Surf,* 116 Hawai'i at 516, 174 P.3d at 355 (quoting *Gray,* 84 Hawai'i at 148, 931 P.2d at 590). They maintain that it would be absurd to interpret HRS § 431:10C–308.5 as governing PIP benefit denials based on actual examinations, but not record reviews, because either type of evaluation can be used to support a denial of payments to medical providers. But, as the district court observed in *Engle* and the hearings officer noted in *Weigel,* there is in fact a logical distinction between a physical examination and a record review. *See Engle,* 402 F.Supp.2d at 1164–65; *Weigel,* ATX–2002–134–P, RO at 8. The claimant understandably has a more substantial interest in selecting the doctor who actually examines her person than in choosing the person who reviews her medical records, especially when the examination is invasive or the medical problem is of a private nature. *See Engle,* 402 F.Supp.2d at 1164–65; *Weigel,* ATX–2002–134–P, RO at 9. Hence, we conclude

that interpreting the term "independent medical examination" as necessarily including an actual examination as a component does not yield an absurd result in contravention of legislative intent. *See Colony Surf,* 116 Hawai'i at 516, 174 P.3d at 355.

In short, the legislative intent underlying HRS § 431:10C–308.5(b) does not undermine the insurance commissioner's understanding that an "independent medical examination" requires some type of actual examination. Consequently, we believe that his interpretation is not palpably erroneous and is therefore worthy of deference. *See Vail,* 75 Haw. at 65–66, 856 P.2d at 1239–40 (deferring to the employees' retirement system's reading of an ambiguous term in HRS § 88–43, because the plaintiff had failed to demonstrate that the reading was palpably erroneous); *Nelson,* 97 Hawai'i at 390–91, 38 P.3d at 109–10 (deferring to the Hawai'i Civil Rights commission's decision interpreting Hawai'i Administrative Rules § 12–46–109, which in turn construed HRS § 378–2 (Supp. 1994), because the agency's interpretation was not palpably erroneous); *Treloar,* 65 Haw. at 424–26, 653 P.2d at 426–27 (according deference to the department of labor and industrial relations' construction of an ambiguous statutory provision in HRS § 386–54, because the department's construction was not palpably erroneous); *State v. McCully,* 64 Haw. 407, 411–14, 642 P.2d 933, 937–38 (1982) (according deference to a postal inspector's testimony regarding the United States Postal Service's customary interpretation of a federal statute governing the opening of mail pursuant to a search warrant authorized by law, because that interpretation was not palpably erroneous); *Holi,* 113 Hawai'i at 198, 205–06, 150 P.3d at 847, 854–55 (deferring to the insurance commissioner's interpretation of HRS § 431:10C–103, which he had enunciated in an administrative rule, in an appeal from a judgment entered in a dispute initiated in the circuit court).[7] We

7. The concurrence maintains that *Vail, Treloar, Nelson,* and *Holi* are distinguishable from the present matter on the ground that they involved either an appeal from an agency decision interpreting a statute, *see Vail,* 75 Haw. at 46–51, 856 P.2d at 1231–33; *Treloar,* 65 Haw. at 418–20, 653 P.2d at 422–24, or an administrative rule

interpreting a statute, *see Nelson,* 97 Hawai'i at 387–88, 38 P.3d at 106–07; *Holi,* 113 Hawai'i at 205–06, 150 P.3d at 854–55. Concurring opinion at 125, 194 P.3d at 1087. The applicability of the deference principle did not, however, turn on those factual circumstances. Rather, the dispositive considerations in the cases were that the

therefore hold that an actual examination, physical or otherwise, is an essential aspect of an "independent medical examination" under HRS § 431:10C–308.5(b).

D. *Because An "Independent Medical Examination" Under HRS § 431:10C–308.5(b) Requires An Actual Examination, Physical Or Otherwise, Dr. Hector's Record Review Did Not Constitute An Independent Medical Examination, And, Therefore, GEICO Did Not Violate The Statute.*

■ In the present matter, Dr. Hector did not actually examine Gillan, but, instead, limited his evaluation to a review of her medical records. Therefore, Dr. Hector did not perform an independent medical examination on Gillan in evaluating the appropriateness of her treatment from Dr. Keller. Because Dr. Hector did not perform an inde-

pendent medical examination within the meaning of HRS § 431:10C–308.5(b), it follows that the statute did not require GEICO to seek Gillan's consent before selecting the doctor. Accordingly, GEICO did not violate the statute when it declined to seek Gillan's consent in selecting Dr. Hector to review her records. The ICA was correct in so holding. *See Gillan,* 117 Hawai'i at 477, 184 P.3d at 792.

## IV. CONCLUSION

In light of the foregoing, we affirm the May 7, 2008 judgment of the ICA.

### Concurring Opinion of ACOBA, J.

I concur in the result reached by the majority,[1] but on the grounds that (1) the interpretation of a statute such as HRS § 431:10C–308.5(b)[2] is a question of law, and,

---

statute at issue contained broad or ambiguous language, that an agency had been charged with carrying out the mandate of the statute, that the agency had interpreted the broad or ambiguous language, and that the agency's interpretation was not palpably erroneous. *See Vail,* 75 Haw. at 66, 856 P.2d at 1240; *Treloar,* 65 Haw. at 423–25, 653 P.2d at 426–27; *Nelson,* 97 Hawai'i at 391, 38 P.3d at 110; *Holi,* 113 Hawai'i at 206, 150 P.3d at 855. Thus, the fact that this case does not concern an agency appeal or an administrative rule is a distinction without a difference.

Were it otherwise, the applicability of the deference principle would, in some cases, depend on a party's choice of forum. The facts of this case provide an instructive illustration. If the Plaintiffs had elected to initiate this proceeding before the commissioner, *see* HRS § 431:10C–212, instead of the circuit court, *see* HRS § 431:10C–314, then, under the concurrence's approach, the deference principle would apply to the commissioner's interpretation of HRS § 431:10C–308.5. Concurring opinion at 125, 194 P.3d at 1087. It is because the Plaintiffs elected to submit the dispute to the circuit court that the concurrence does not believe that the principle applies. *Id.* Although the deference principle may not have been dispositive in the present matter, *see* concurring opinion at 18–19 (discussing Sen. Conf. Comm. Rep. No. 117, in 1998 Senate Journal, at 794), it may well have a controlling effect in other cases. Individuals should not be allowed to circumvent the deference principle through forum shopping, a practice that "should be discouraged as 'inimical to sound judicial administration.'" *See Moss v. Am. Int'l Adjustment Co.,* 86 Hawai'i 59, 65, 947 P.2d 371, 377 (1997) (quoting *Jordan v. Hamada,* 64 Haw. 446, 448, 643 P.2d 70, 72 (1982)) (hold-

ing that, in light of, *inter alia,* forum shopping concerns, "the first party to choose a forum for the resolution of a no-fault dispute binds the other party to that forum unless the circuit court finds that the parties have entered into a mandatory and binding arbitration agreement" (emphasis omitted)). Yet that is precisely what the concurrence's approach would permit.

1. The majority holds that (1) "the term 'independent medical examination' [(IME),] as it appears in [Hawai'i Revised Statutes (HRS)] § 431:10C–308.5(b) [(2005)], is ambiguous with respect to whether an actual examination of the claimant ... is an essential aspect of the 'examination[,]'" majority opinion at 117, 194 P.3d at 1079 (capitalization altered), therefore, (2) it "defers to the insurance commissioner's interpretation[]" of the statute, "unless his interpretation is palpably erroneous[,]" *id.* at 117–18, 194 P.3d at 1079–80 (capitalization altered), (3) "the insurance commissioner's interpretation that an actual examination is a necessary component of an [IME] ... is not palpably erroneous[,]" *id.* at 119, 194 P.3d at 1081 (capitalization altered), hence (4) "Dr. [Bruce] Hector's record review did not constitute an [IME]," *id.* at 123, 194 P.3d at 1085 (capitalization altered) and therefore, (5) Respondent/Defendant–Appellant Government Employees Insurance Company (Respondent) "did not violate the statute[,]" *id.* (capitalization altered).

2. HRS chapter 431:10C pertaining to Motor Vehicle Insurance, section 308.5(b), titled "Limitation on Charges," states that "[c]harges for [IMEs], *including* record reviews, physical examinations, history taking, and reports[,]" (emphasis added), are subject to various requirements as described *infra.*

hence, this court is competent to perform that task without reference to an agency's interpretation of the subject statute, (2) if the term IME in HRS § 431:10C–308.5(b) is ambiguous with respect to "record reviews," as the majority holds, (3) resort must be had to legislative history to define that term, (4) because the legislative history categorizes record reviews as an "ancillary procedure incident to the conducting of an IME," Sen. Conf. Comm. Rep. No. 117, in 1998 Senate Journal, at 794, a record review is part of an IME involving a physical examination and not independent of it, (5) however, other bases for the same result announced by the United States district court (district court) in *Engle v. Liberty Mutual Fire Insurance Co.*, 402 F.Supp.2d 1157 (D.Haw.2005), on which the majority relies, would contravene the language of HRS § 431:10C–308.5(b) and the legislative history therefor, and may adversely affect application of that statute in the future.

I.

It has been stated that "it is the function of the courts to interpret the law, and courts are in no way bound by an [administrative] agency's legal interpretation." *Chavez v. Mountain States Constructors*, 122 N.M. 579, 929 P.2d 971, 976 (N.M.1996) (internal quotation marks and citation omitted); *see also Baerst v. State Bd. of Educ.*, 34 Conn.App. 567, 642 A.2d 76, 78 (Conn.App.1994) (where interpretation of statute is issue of first impression, courts do not defer to agency interpretation but, rather, "expound and apply governing principles of law" (internal quotation marks and citations omitted)); *Camara v. Agsalud*, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984) ("[T]his court [is] free to reverse the agency's decision if affected by an error of law" (citing HRS 91–14(g)(4))); *Newark Valley Cent. School Dist. v. Pub. Employment Relations Bd.*, 83 N.Y.2d 315, 610 N.Y.S.2d 134, 632 N.E.2d 443, 445 (N.Y.1994) (holding that "[d]eference to [the agency] is not required ... if the issue is one of statutory interpretation, dependent on discerning legislative intent, as statutory construction is the function of the courts" (citation omitted)).

When reviewing an agency determination, this court applies standards codified at HRS § 91–14(g) (1993) to the agency decision. *Paul's Elec. Serv., Inc. v. Befitel*, 104 Hawai'i 412, 417, 91 P.3d 494, 499 (2000). But the interpretation of HRS § 431:10C–308.5(b) is not before us on appeal from an agency decision pursuant to HRS § 91–14(g). *Cf. Camara*, 67 Haw. at 216, 685 P.2d at 797 (holding that appeal from agency decision entitled to deference only if "consistent with legislative purpose").

Rather, the issue raised on certiorari is whether the first circuit court (the court) or the Intermediate Court of Appeals (ICA) erred in its interpretation of a statute. It is well established that this is a question of law, to be reviewed *de novo* under the right/wrong standard. *See, e.g., Kimura v. Kamalo*, 106 Hawai'i 501, 507, 107 P.3d 430, 436 (2005) (stating, on appeal from partition action in trial court, that "[t]he interpretation of a statute is a question of law[ ]" and that "[r]eview is de novo, and the standard of review is right/wrong[ ]"); *see also State v. Hicks*, 113 Hawai'i 60, 70, 148 P.3d 493, 503 (2006) (stating, on appeal from trial court, that "[t]he interpretation of a statute is a question of law reviewable de novo" (quoting *State v. Kalani*, 108 Hawai'i 279, 283, 118 P.3d 1222, 1226 (2005))); *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (same (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996))).

Thus, "[w]hen construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995) (quoting *Crosby v. State Dep't of Budget & Fin.*, 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994)). However, when a statute is ambiguous, we consider the context of the ambiguous language or legislative history.

In construing an ambiguous statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–

15(1) (1985). Moreover, the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool. *Id.* at 19, 904 P.2d 893, 904 P.2d at 904 (internal quotation marks, citations, and brackets omitted). *See, e.g., In re Cunha,* 104 Hawai'i 267, 271, 88 P.3d 202, 206 (2004) (noting that "courts may take legislative history into consideration in construing a statute" on appeal involving application of Uniform Probate Code (quoting *Franks v. City & County of Honolulu,* 74 Haw. 328, 335, 843 P.2d 668, 672 (1993))); *State v. Sullivan,* 97 Hawai'i 259, 262, 36 P.3d 803, 806 (2001) (examining legislative history to determine whether statute provided a right to jury trial); *State v. Edwards,* 96 Hawai'i 224, 233, 30 P.3d 238, 247 (2001) (reviewing legislative history to determine whether police satisfied statutory requirement to contact attorney).

In this case, as discussed *infra,* there is legislative history readily at hand to clarify any perceived ambiguity in HRS § 431:10C–308.5. Therefore, it is neither appropriate nor necessary to defer to the insurance commissioner's interpretation of the definition of an IME. *See In re Water Use Permit Applications,* 94 Hawai'i 97, 144, 9 P.3d 409, 456 (2000). "If we determine, based on [legislative history], that the legislature has unambiguously spoken on the matter in question, then our inquiry ends." *Id.*

Despite our established rules for construing ambiguous statutes, the majority maintains that the insurance commissioner's interpretation of the definition of an IME in *Weigel v. Liberty Mutual Fire Insurance Co.,* ATX–2002–134–P (Hawai'i Insurance Commissioner's Final Order Mar. 31, 2005) is "worthy of deference." Majority opinion at 122, 194 P.3d at 1084. In *Weigel,* the insurance commissioner, without citing to case law, applicable Hawai'i Administrative Rules (HARs), or any other authority, defined an IME solely by looking at the "context of the entire statutory provision[.]" ATX–2002–134–P, RO at 8.[3] The majority cites *Treloar v. Swinerton & Walberg Co.,* 65 Haw. 415, 653 P.2d 420 (1982), *Vail v. Employees' Retirement System,* 75 Haw. 42, 856 P.2d 1227 (1993), *Holi v. AIG Hawaii Insurance Co.,* 113 Hawai'i 196, 150 P.3d 845 (App.2007), *Nelson v. University of Hawaii,* 97 Hawai'i 376, 38 P.3d 95 (2001), and *State v. McCully,* 64 Haw. 407, 642 P.2d 933 (1982), in support of its contention. *See* majority opinion at 118–19, 122, 194 P.3d at 1080–81, 1084. Respectfully, the majority's reliance on these cases is misplaced.

First, *Treloar* and *Vail* involved direct appeals from *agency* decisions, which, as has already been noted, is not the situation here. *See Treloar,* 65 Haw. at 421–22, 653 P.2d at 424–25 (appeal from decision of Labor and Industrial Relations Board); *Vail,* 75 Haw. at 67, 856 P.2d at 1230 (appeal from decision of Employee's Retirement System). Accordingly, neither *Treloar* nor *Vail* supports the contention that we should defer to an agency in the case at bar.

Second, unlike the situation at bar, both *Nelson* and *Holi* involved the application of HAR. Arguably, where an agency promulgates a rule, we will accord consideration to its interpretation of its own rules. *See, e.g., Holi,* 113 Hawai'i at 205, 150 P.3d at 854 (deferring to agency's definition of disputed term in HAR). But our case is not concerned with the application of an administrative rule by an agency; therefore, the question of deference to any agency in *Nelson* is obviously inapposite. Accordingly, *Nelson* is not authority for deferring to the insurance commissioner's construction of a statute, rather than a rule.

Furthermore, the majority misconstrues the issue of deference to the Hawai'i Civil Rights Commission in *Nelson.* In that case, this court was concerned with modification of the test for establishing a hostile environment sexual harassment claim [HESH] set forth in this court's earlier decision in *Steinberg v. Hoshijo,* 88 Hawai'i 10, 18, 960 P.2d 1218, 1226 (1998). *Steinberg's* test, however, was based entirely on the applicable HAR. *Id.* To reiterate, this case does not involve an agency's interpretation of its own promulgat-

---

3. The commissioner's ruling in *Weigel* is not before us on appeal today, and in that sense is "unrelated" to the present proceedings.

ed rules. Hence, on the facts themselves, *Nelson* does not apply.

Third, in *McCully*, this court said that the dispositive regulation was not in effect, and there were no interpretations of the statute by federal courts. 64 Haw. at 412, 642 P.2d at 937. This court relied on the practice of the postal service in reaching its determination. It is unclear why *McCully* did not consider the legislative history of the statute in that particular case. The unquestioned established principle as we have reaffirmed is that "[w]hen the language of a provision [in a federal statute] is ambiguous, we look to the legislative history of the statute in question to ascertain its confines." *Keauhou Master Homeowners Ass'n, Inc. v. County of Hawai'i*, 104 Hawai'i 214, 219, 87 P.3d 883, 888 (2004) (construing the Fair Debt Collection Practices Act by looking to its legislative history); *In re Island Airlines*, 47 Haw. 1, 123, 384 P.2d 536, 571 (1963) ("The rule is that the legislative history of an act may be examined in ascertaining the intention of Congress in that act[.]"). Thus, *McCully* cannot stand for the unequivocal rule advocated by the majority.[4]

Indeed, the majority concedes that unlike this case, *Vail, Treloar, Nelson,* and *Holi* "involved either an appeal from an agency decision . . ., see *Vail*, 75 Haw. at 46–51, 856 P.2d at 1231–33; *Treloar*, 65 Haw. at 418–20, 653 P.2d at 422–24, or an administrative rule interpreting a statute, see *Nelson*, 97 Hawai'i at 387–88, 38 P.3d at 106–07; *Holi*, 113 Hawai'i at 205–06, 150 P.3d at 854–55[,]" but inexplicably states that this is a "distinction without a difference." Majority opinion at 122–23, 194 P.3d at 1084–85 n. 7. Rather, the majority states that "the dispositive considerations in the cases were that the statute . . . contained broad or ambiguous language, that

an agency had been charged with carrying out the mandate of the statute, that the agency had interpreted the broad or ambiguous language, and that the agency's interpretation was not palpably erroneous[,]" without citation to anything in the language of these cases. Majority opinion at 123, 194 P.3d at 1085 n. 7.

Contrary to the majority's position, the factual distinctions between an appeal from an agency decision and an appeal from the trial courts are the salient foundational facts that determine whether deference to an agency applies at all. *Cf. Kalani*, 108 Hawai'i at 285, 118 P.3d at 1228 (on appeal from trial court decision, statute interpreted *de novo* by examining legislative history); *Paul's Elec. Serv.*, 104 Hawai'i at 416, 91 P.3d at 498 (discussing deference standard applied on appeal from agency decision). Respectfully, the majority distorts our accepted precepts of statutory construction. Its approach is a novel departure from our established principle that ambiguous statutes raised on appeal from a court's construction are to be defined by resort to legislative history. *See In re Cunha*, 104 Hawai'i at 271, 88 P.3d at 206; *State v. Sullivan*, 97 Hawai'i 259, 262, 36 P.3d 803, 806 (2001); *State v. Edwards*, 96 Hawai'i 224, 233, 30 P.3d 238, 247 (2001); *Franks*, 74 Haw. at 335, 843 P.2d at 672.

By way of seeming justification for its view, the majority opines that deference in this case "reflects a sensitivity to the proper roles of the political and judicial branches insofar as the resolution of ambiguity in a statutory text is often more a question of policy than law." Majority opinion at 118, 194 P.3d at 1080 (quoting *In re Water Use*, 94 Hawai'i at 145, 9 P.3d at 457 (internal quotation marks omitted)).[5] To the contrary,

---

**4.** *McCully* involved the postal service's practice of allowing searches of parcels in its possession based on both state and federal search warrants. 64 Haw. at 408, 642 P.2d at 935. The defendants argued it was the practice of the agency itself that rendered the warrant invalid. *See id.* at 408, 642 P.2d at 935. Therefore, *McCully* is akin to situations involving direct appeals from agency decisions, which, as has already been noted, is not the situation presently before this court. As noted, the court in *McCully* did not utilize any of this court's established methods of interpreting an ambiguous statute, such as its

context, *Awakuni v. Awana*, 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007), or legislative history, *Keauhou*, 104 Hawai'i at 219, 87 P.3d at 888. Because the situation before this court involves a determination of whether the actions of a private party, not an administrative agency, conformed to statutory requirements, *McCully* is distinguishable.

**5.** Respectfully, the deference principle in *In re Water Use* is inapposite. *In re Water Use*, like *Treloar* and *Vail*, involved an appeal from an agency decision, a situation not before this court

such policy questions are precisely those to be resolved by reference to the legislature's intent rather than by reference to an agency's once-removed view of the same statute. In adopting its approach, the majority abdicates our "obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history," *Ka Pa'akai O Ka'Aina v. Land Use Commission*, 94 Hawai'i 31, 41, 7 P.3d 1068, 1078 (2000) (appeal from agency decision discussing deference in terms of *administrative tribunal*) (internal quotation marks and citation omitted), and creates uncertainty in our law on applicable standards of review.

Finally, the majority maintains that choosing not to defer to the insurance commissioner's interpretation in this case would result in forum shopping to attain a desired standard of deference. *See* majority opinion at 123, 194 P.3d at 1085 n. 7. (citing *Moss v. Am. Int'l Adjustment Co.*, 86 Hawai'i 59, 65, 947 P.2d 371, 377 (1997) (other citation omitted)).[6] Of course, the majority's contention regarding forum shopping is not raised or supported by anything in the record and is based, then, on pure speculation. But, more significantly, this argument by the majority is an attack on the statute itself. Without question, the legislature chose to ensure access through a variety of avenues for claimants to bring disputes involving insurance coverage. On its face, HRS chapter 431:10C allows an insured to challenge a denial of insurance benefits in three alternative ways—through arbitration, HRS § 431:10C–213 (2005); in an administrative hearing, HRS § 431:10C–212 (2005); or in the circuit court, HRS § 431:10C–314 (2005). The benefits of providing claimants with multiple options obviously outweighed any concerns the legislature had about choice of forum. In limiting our review of the statute based on this ground, the majority's rationale casts

HRS chapter 431:10C in conflict with its own plain language.

Assuming, *arguendo*, the agency's application of a statute is entitled to consideration, the overriding rule is that this court is duty-bound to determine whether such application comports with the language of the statute. *See State v. Lo*, 66 Haw. 653, 659, 675 P.2d 754, 758 (1983) (stating that "the starting point for interpreting a statute is the language of the statute itself" (citation omitted)). Further, "[t]he rule of judicial deference ... does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose," and "we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation." *In re Water Use*, 94 Hawai'i at 145, 9 P.3d at 457.

In short, none of the cases cited by the majority hold that a court should defer to an agency's interpretation of a statute in the situation we face today. Under our well-established tenets, in construing an ambiguous statute, this court is obligated to review legislative history to determine legislative intent. *Sullivan*, 97 Hawai'i at 262, 36 P.3d at 806; *State v. Putnam*, 93 Hawai'i 362, 367, 3 P.3d 1239, 1244 (2000). As noted *infra*, the legislative history in this case provides this court with a dispositive basis for interpreting the statute at issue. Therefore, we need not defer to the insurance commissioner's interpretation of HRS § 431:10C–308.5(b) in this case.

The district court in *Engle*, whose decision the majority relies on, itself examined the legislative history of HRS § 431:10C–308.5(b), determining that such legislative history established that record reviews were not IMEs.[7] We are no less adept at constru-

today. Here, the subject of review is the trial court's interpretation of a statute, not an appeal from the decision of an administrative tribunal.

**6.** Contrary to the majority's implication, *Moss* has nothing to do with the deference principle as it relates to forum shopping. Instead, in *Moss*, the court held that a claimant could not file separate, concurrent actions in the three forums provided by HRS chapter 431:10C. 86 Hawai'i

at 65, 947 P.2d at 377. Nothing in this concurrence disagrees with that proposition.

**7.** The majority maintains that *Engle* supports the insurance commissioner's interpretation that an IME includes a physical examination. *See* majority opinion at 116–17, 122, 194 P.3d at 1078–79, 1084. According to the majority, deference to the insurance commissioner is appropriate because the legislative history of HRS § 431:10–C–308 is silent on "whether a record review

ing our own state statutes by resort to legislative history than the district court in *Engle*, the case relied on by the majority.

## II.

HRS § 431:10C–308.5 governs charges for the medical services enumerated in HRS § 431:10C–103.5(a) (2005), which services are deemed to be necessary and appropriate treatment for injuries sustained in a motor vehicle accident. HRS § 431:10C–308.5, entitled "Limitation on charges," provides in pertinent part:

> (a) As used in this article, the term "workers' compensation supplemental medical fee schedule" means the schedule adopted and as may be amended by the director of labor and industrial relations for workers' compensation cases under chapter 386, establishing fees and frequency of treatment guidelines. References in the workers' compensation supplemental medical fee schedule to "the employer", "the director", and "the industrial injury" shall be respectively construed as references to "the insurer", "the commissioner", and "the injury covered by personal injury protection benefits" for purposes of this article.
>
> (b) *The charges and frequency of treatment for services specified in section 431:10C–103.5(a),* except for emergency services provided within seventy-two hours following a motor vehicle accident resulting in injury, *shall not exceed the charges and frequency of treatment permissible under the workers' compensation supplemental medical fee schedule. Charges for [IMEs], including record reviews, physical examinations, history taking, and reports, to be conducted by a licensed Hawaii provider unless the insured consents to an out-of-state provider, shall not exceed the charges permissible under the appropriate codes in the workers' compensation supplemental medical fee schedule.* The workers' compensation supplemental medical fee

schedule shall not apply to [IMEs] conducted by out-of-state providers if the charges for the examination are reasonable. *The independent medical examiner shall be selected by mutual agreement between the insurer and claimant; provided that if no agreement is reached, the selection may be submitted to the commissioner, arbitration or circuit court. The independent medical examiner shall be of the same specialty as the provider whose treatment is being reviewed,* unless otherwise agreed by the insurer and claimant. . . .

(Emphases added.) In sum, the HRS § 431:10C–308.5 requirements are that (1) the "charges and frequency of treatment" are governed by the workers' compensation fee schedule, (2) the examination be conducted "by a licensed Hawaii provider" unless the claimant "consents to an out-of-state provider," (3) the examiner "be selected by mutual agreement[,]" (4) if the insurer and claimant cannot agree on an examiner, "the selection may be submitted to the commissioner, arbitration, or the circuit court[,]" and (5) the examiner must be of the same specialty as the provider.

The term "IME" is not explicitly defined in the statute. When a term is not statutorily defined, this court "may resort to legal or other well-accepted dictionaries as one way to determine [its] ordinary meaning." *Leslie v. Bd. of Appeals of the County of Hawai'i,* 109 Hawai'i 384, 393, 126 P.3d 1071, 1080 (2006). An IME is defined in the dictionary as "[a]n assessment of a person's physical condition and health that is made by an impartial healthcare professional, usu[ally] a physician." *Black's Law Dictionary* 785 (8th ed.2004). However, this definition of IME does not expressly require a physical examination. An IME is described further in HRS § 431:10C–308.5(b) as "including" separate items such as "record reviews, physical examinations, history taking, and reports."[8]

alone is an [IME]." *See* majority opinion at 121, 194 P.3d at 1083. However, this conclusion by the majority is inconsistent, because *Engle* itself examined the legislative history of HRS § 431:10–C–308, finding that it "establishe[d] that mere record reviews are not IMEs[,]" 402

F.Supp.2d at 1164, and the majority relies on *Engle.*

**8.** According to Petitioners/Plaintiffs–Appellees Margret Gillan and Howard Keller, M.D. (Petitioners), this clause was added in 1998, to curb

The verb "to include" is defined as "to place, list, or rate as a component of a whole *or* of a larger group, class, or aggregate." *Webster's Third New Int'l Dictionary* 1143 (unabridged 1993) (emphasis added). Hence, there are two possible applications of the term "including." Respondent espouses the interpretation of the district court, "that an IME involves an in-person examination[,]" and not record reviews alone. (Internal quotation marks omitted.) In oral argument, the insurance commissioner took the position that an IME is a physical examination, and the other enumerated procedures are identified for billing purposes only, apparently eschewing other applications of the term. The majority opts for the first Webster's definition, *i.e.*, that a record review is "a component of" an IME, which must include a physical examination of the claimant. *See* majority opinion at 123, 194 P.3d at 1085 (holding that "an actual examination ... is an essential aspect of an [IME] under HRS § 431:10C–308.5(b)").

The second Webster's definition comports with decisions holding that the term "including" connotes an illustrative, rather than exclusionary, list.[9] Under this definition, HRS § 431:10C–308.5(b) would apply "to any medical review, whether it involved a physical

exam[ination] or a record review[,]" as Petitioners contend. Petitioners and the court seemingly apply the second definition, relying on the decision by the Circuit Court of the First Circuit in *Sakoda v. AIG Hawaii*, Civ. No. 04-1-0436-03(BIA) (Haw.Cir.Ct. July 25, 2005), in which Judge Bert Ayabe concluded that record reviews should be treated as IMEs. Specifically, they emphasize Judge Ayabe's declaration that

> [i]f a party chooses to do a records. [sic] review only and not conduct a physical examination, that is [its] choice. However, that does not mean that [it] do[es] not have to meet the requirements of HRS § 431:10C–308.5(b).

> To hold otherwise would undermine the "reason and spirit of the law"—*to insure a fair process of review for both sides involved by selecting a neutral, unbiased examiner with an adequate amount of knowledge.*

*Id.* (emphasis added).

### III.

Because there are two possible interpretations of the term "including," we must resort to legislative history to determine which one

---

abuse by insurers who circumvented the price limitations on IMEs by paying independent medical examiners separately for physical examinations and other services such as record reviews.

9. The term "including" may (1) provide illustrations of a general description without imposing limitations on the general description, (2) clarify examples of what is to be included in a class, or (3) distinguish between members and non-members of a general class without limiting the general class. *See Cummins Inc. v. United States,* 377 F.Supp.2d 1365, 1372–73 (Ct. Int'l Trade 2005). In that light, "including" has been deemed illustrative rather than exclusionary. *See, e.g., United States v. Cornelio-Pena,* 435 F.3d 1279, 1284 (10th Cir.2006) (where legislative history indicated that the term "include" was not meant to indicate an exhaustive list, it was treated as illustrative and the court did apply *expressio unius est exclusio alterius*); *McWhorter v. McWhorter,* 346 Ark. 475, 58 S.W.3d 840, 845 (Ark.2001) (declining to apply *expressio unius est exclusio alterius* to limit the definition of "income" for purposes of child support order in light of legislative purpose of "interpret[ing] income broadly for the benefit of the child" (internal quotation marks and citations omitted));

*Pro-Art Dental Lab, Inc. v. V-Strategic Group, LLC,* No. SC07-1397, 2008 WL 2679160 at *10 (Fla. July 10, 2008) (holding that "[t]he phrase 'including motions to quash' logically implies that motions to quash are included in addition to, not to the exclusion of, other permissible motions"); *Paxson v. Bd. of Educ. of School Dist. No. 87, Cook County, Ill.,* 276 Ill.App.3d 912, 213 Ill.Dec. 288, 658 N.E.2d 1309, 1314 (Ill.App. 1995) (holding that "the word 'including,' in its most commonly understood meaning, [is] a term of enlargement, not of limitation"). One scholar recently explained that the term "including" inherently implies a partial list, declaring that

> it should not be used to introduce an exhaustive list, for it implies that the list is only partial. In the words of one federal court, "It is hornbook law that the use of the word including indicates that the specified list ... is illustrative, not exclusive." *Puerto Rico Maritime Shipping Auth. v. I.C.C.,* 645 F.2d 1102, 1112 n. 26 (D.C.Cir.1981).

*Texas Prop. & Cas. Ins. Guar. Ass'n/Southwest Aggregates, Inc. v. Southwest Aggregates, Inc.,* 982 S.W.2d 600, 608–09 (Tex.App.1998) (quoting Bryan A. Garner, *A Dictionary of Modern Legal Usage* 431–32 (2d ed.1995)) (emphasis added) (ellipsis in original).

of the two shall apply. *Univ. of Haw. v. Befitel,* 105 Hawai'i 485, 488, 100 P.3d 55, 58 (2004) (assuming, *arguendo,* that there is "doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in [the] statute[,]" it is ambiguous and therefore, this court must "look to legislative history for assistance in construing the statute" (internal quotation marks and citations omitted)). Pertinent to this issue, in *Engle,* the district court concluded that "the term [IME] refers to a procedure that includes an in-person examination[,]" 402 F.Supp.2d at 1162, based on (1) the "ordinary and natural" meaning of the term "including," *id.* at 1162–63, (2) the legislative history of HRS § 431:10C–308.5, *id.* at 1165–66, (3) case law equating physical examinations conducted pursuant to the rules of civil procedure to IMEs, *id.* at 1162–63, and (4) its concern that interpreting "including" as introducing an illustrative list would (a) prevent insurers from utilizing "in-house providers" to make coverage determinations, *id.* at 1163, and (b) "give insureds a veto power" over the choice of any reviewing physician, *id.*

### IV.

In contrast to the district court's conclusion (1), the term "including" is ambiguous, as set forth above. Thus, under well-established tenets of Hawaii's case law, resort to legislative history was required. The district court's conclusion (2) did consider the legislative history of the 1998 amendments, which added the language in controversy here. The district court decided that the legislative intent was to prevent medical examiners conducting physical examinations from inflating costs by "unbundling" the services rendered for billing purposes.[10] It explained that, in its view,

> [t]he purpose of the 1998 amendments was to *require that charges for an IME include charges for all parts of the IME, not just for the physical examination portion.* Thus, the statutory restrictions on IME charges extended to any record review, history taking, or report that was part of the IME. *The legislative history does not*

*indicate that the amendment was intended to subject record reviews that are not part of IMEs to IME regulations.* To the contrary, the Committee Report distinguishes between IMEs and parts of IMEs such as "the report or *other ancillary procedures incident* to the conducting of an IME." *Engle,* 402 F.Supp.2d at 1164 (quoting Sen. Conf. Comm. Rep. No. 117, in 1998 Senate Journal, at 794) (emphases added). It is not disputed that the 1998 amendments were intended to prevent the unbundling of services provided by medical examiners with regard to IMEs.

The portion of the legislative report quoted above states that the 1998 amendments were designed to prevent examiners from circumventing cost containment measures by "submitting a separate charge for the report or other ancillary procedures incident to the conducting of an IME." Sen. Conf. Comm. Rep. No. 117, in 1998 Senate Journal, at 794. It appears, then, that the legislature intended that all of the procedures conducted in association with a single IME would be included in a single bill, which would be governed by the workers' compensation fee schedule. Hence, a record review must be considered a subsidiary part of the IME, not a separate and independent example of an IME. Based on legislative history, the term "including" in HRS § 431:10C–308.5(b), then, must be construed in consonance with the first dictionary definition of that term. *See supra.* In my view, this is dispositive of the question of whether a record review is an "IME" or not under this particular statute.

### V.

### A.

Consequently, I respectfully disagree with any extension of other reasoning in *Engle* because such reasoning may adversely affect the future application of the subject statute. As ·to its conclusion (3), the district court explained that "[n]umerous court orders ... use 'IME' to refer to the 'Physical and Mental Examination' procedures set forth in [Hawai'i Rules of Civil Procedure (HRCP) Rule]

---

10. In this regard, the district court's understanding of the relevant legislative history is consistent

with the position advocated by the insurance commissioner at oral argument.

35 and [Federal Rules of Civil Procedure (FRCP) Rule] 35." *Engle,* 402 F.Supp.2d at 1162 (citations omitted). The majority apparently agrees. *See* majority opinion at 127, 194 P.3d at 1089 (citing *Engle* for the proposition that "[c]ourts routinely use the term 'IME' to describe procedures in which in-person examinations were conducted[ ]").

In response to the foregoing, the majority asserts that it "merely cite[s] the *Engle* decision as illustrative of how courts have generally employed the term [IME,]" and "do[es] not cite *Engle* for the proposition that HRCP Rule 35 and [FRCP] Rule 35 are in fact instructive in determining whether a record review alone constitutes an '[IME]' under HRS § 431:10C–308.5." Majority opinion at 127, 194 P.3d at 1089 n. 6. To the contrary, *Engle's* conclusions on this point cannot be separated from its cited authority. As noted above, *Engle's* interpretation of an IME *is* based on references to HRCP Rule 35 and FRCP Rule 35.

Indeed, following this reasoning in *Engle,* the majority also rests on "the district court['s] observ[ation] in *Engle* ... [that] there is in fact a logical distinction between a physical examination and a record review." Majority opinion at 122, 194 P.3d at 1084. The "logical distinction" that *Engle* drew between an IME and a record review was based on its conclusion that an "in-person examination is a necessary part of an IME." *Engle,* 402 F.Supp.2d at 1164. But *Engle* reached this conclusion by comparing IMEs

conducted pursuant to HRS § 431:10C–308.5 to examinations conducted under FRCP Rule 35 and HRCP Rule 35, thus confirming that *Engle* did treat HRCP Rule 35 and FRCP Rule 35 as "instructive." *See id.* at 1162.

However, in my view this comparison is inapposite. FRCP Rule 35, entitled "Physical and Mental Examinations," states that where the physical or mental condition of a party is at issue, the court may order that person to undergo a physical or mental examination for good cause and with proper notice.[11] HRCP Rule 35 is virtually identical.[12] However, FRCP Rule 35 and HRCP Rule 35 examinations are plainly not analogous.

Significantly, the legislative history of HRS § 431:10C–308.5(b) is devoid of any reference to those rules. Both iterations of Rule 35 permit one party to hire any medical examiner it desires to examine the other and testify on behalf of the former. Manifestly, such an examiner is not "independent" in the sense mandated by HRS § 431:10C–308.5. The expert's fees are not limited in any way by the rules because they are not based on an underlying purpose of cost containment. The court orders the examination upon a motion by the parties. The moving party is not required to obtain the consent of the party to be examined as to the identity of the examiner. Thus, it is evident that examinations under the two Rule 35 versions are not comparable to IMEs under HRS § 431:10C–308.5.

---

11. FRCP Rule 35(a), entitled "Order for Examination," provides, in its entirety:

> (1) *In general. The court* where the action is pending may order a party whose mental or physical condition—including blood group—is in controversy to submit to a *physical or mental examination* by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody or under its legal control.
>
> (2) *Motion and Notice; Contents of the Order.* The order:
>
> (A) *may be made only on motion for good cause* and on notice to all parties and the person to be examined; and
>
> (B) must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it.

(Emphases added.) (Italics in original.)

12. HRCP Rule 35(a), pertaining to orders for physical and mental examinations, states, in its entirety, that

> [w]hen the mental or physical condition (including the blood group) or a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in the party's custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

Likewise, the cases cited by the district court are plainly inapposite. *Sice v. Oldcastle Glass, Inc.*, No. Civ. A.03–BB–114, 2005 WL 82148, at *3 (D.Colo. Jan.10, 2005), involved a FRCP Rule 35 "IME."[13] Similarly, the court in *Glover v. Grace Pacific Corp.*, 86 Hawai'i 154, 160, 948 P.2d 575, 581 (App. 1997), simply assumed that the examination requested pursuant to HRCP Rule 35 was an IME.[14] The statement from *Liftee v. Boyer*, 108 Hawai'i 89, 94, 117 P.3d 821, 826 (App. 2004), quoted by the district court, finding that a doctor who had performed a physical examination "was doing a Rule 35 IME," is incomplete.[15]

### B.

As to point (4)(a) of the district court's analysis, on their faces, the restrictions applicable to an IME would apply only where the schedule governing workers' compensation applies. Contrary to the district court's assertion that defining a record review as an IME would prevent insurers from "us[ing] in-house providers at all," *Engle*, 402 F.Supp.2d at 1163, it is manifest that the workers' compensation schedule does not apply to examinations by in-house personnel who are compensated directly by the insurer. Additionally, an employee of the insurer could not be deemed an "independent" examiner. Thus, it follows that the insurer's em-

ployee could not conduct an *independent* medical examination under HRS § 431:10C–308.5. Finally, the term "medical" indicates that the examination is to be performed by a medical professional, not an insurance adjuster. Consequently, it is evident that an in-house review of claims is not an IME and is therefore not affected by the requirements of HRS § 431:10C–308.5(b).

As to point (4)(b) of the district court's analysis, again the statute's requirements do not apply to insurers' paid personnel. The district court's apparent concern that extending HRS § 431:10C–308.5 to procedures (if independently denominated as an IME) other than physical examinations would require insurers "to retain licensed Hawaii providers absent insureds' consent[,]" *id.* at 1163, and empower claimants to "veto" the insurers' attempts to retain examiners of their choice to evaluate claims, *id.*, then, is without basis. The district court does not acknowledge the express "independent" language in the statute. Moreover, the statute plainly states that if the parties cannot agree on a provider to perform the IME, "the selection may be submitted to the commissioner, arbitration, or circuit court." HRS § 431:10C–308.5(b). Hence, contrary to the district court's decision, the claimant does not have any "veto power" at all that would impinge on an insur-

(Emphasis added.)

13. In *Sice*, a motion for an "IME" pursuant to FRCP Rule 35(a) was granted. However, it must be noted that it was the defendant who identified the requested examinations as IMEs. *See Sice*, 2005 WL 82148, at *1 (explaining that the court was clarifying its order "granting the defendant's Motion to Require Attendance at [FRCP Rule] 35[IME] Appointments"). Moreover, the *Sice* court was determining whether "good cause" existed for two of the examinations requested and whether they were the type of examinations contemplated by the rule. *Id.* at *2–3. Accordingly, that court's analysis does not inform the construction of HRS § 431:10C–308.5(b).

14. In *Glover*, the ICA held that if the defendant had filed "a motion for an IME ... pursuant to HRCP Rule 35," 86 Hawai'i at 159, 948 P.2d at 580, it would have been granted because "Glover's physical injuries and damages were in controversy" and his "claim of physical injuries provided good cause for an IME order[,]" *id.* at 160, 948 P.2d at 581 (footnote and internal quotation marks omitted).

15. In discussing *Liftee*, the district court excerpted a transcript of proceedings in which the first circuit court seemingly correlated a HRCP Rule 35 examination to an IME. *See Engle*, 402 F.Supp.2d at 1162 (quoting *Liftee*, 108 Hawai'i at 94, 117 P.3d at 826). However, the full quotation is far more ambiguous. The first circuit court found that the doctor, in examining the plaintiff, "was doing a Rule 35 IME *or medical examination*," such that he was defendant's agent, "and therefore [the doctor's report] becomes an admission under [Hawai'i Rules of Evidence Rule] 803(a) albeit a vicarious admission through an agent." *Liftee*, 108 Hawai'i at 93, 117 P.3d at 825 (emphasis added). With all due respect, this remark, taken in context, cannot be reasonably equated with a definitive conclusion that a HRCP Rule 35 examination is the same or similar to an IME under HRS § 431:10C–308.5. Furthermore, inasmuch as the first circuit court in *Liftee* was applying the Hawai'i Rules of Evidence-related hearsay exceptions, and was not construing either HRCP Rule 35 or HRS § 431:10C–308, this statement cannot be accorded any weight.

ers' choice of in-house personnel. *See Engle,* 402 F.Supp.2d at 1163.

Based on the foregoing, I would respectfully decline to adopt these aspects of the district court's construction of HRS § 431:10C–308.5.

## VI.

Finally, I note that the court's belief that the "reason and the spirit of the law" support the view that a record review should be treated as an IME, is not without appeal. Two significant propositions are evident in the legislative history. First, the legislature intended to contain the costs of IMEs. In 1992, the legislature amended portions of HRS chapter 431, article 10C, relating to motor vehicle insurance. *See* 1992 Haw. Sess. L. Act 124, §§ 1–18, at 210. Related to those amendments, the House Committees on Consumer Protection and Commerce and Judiciary reported that the amendments served dual purposes, namely "*reducing litigation* [in combination] with *medical cost containment,*" with the ultimate goal being that ninety percent of motor vehicle insurance claims would be resolved without litigation. Hse. Stand. Comm. Rep. No. 1271–92, in 1992 House Journal, at 1391 (emphases added). To that end, "[t]he major provisions" of the bill included the "adoption of a fee schedule modeled on the worker's [sic] compensation medical fee schedule[.]" *Id.*[16] The language central to this dispute, *viz.,* "including record reviews, physical examinations, history taking, and reports," was added to HRS § 431:10C–308.5(b) in 1998. 1998 Haw. Sess. L. Act 275, § 26, at 935.[17] The Conference Committee believed that this

change, with the other amendments, would "continu[e] the trend of decreasing automobile insurance rates of . [Hawaii's] driving public[.]" Hse. Conf. Comm. Rep. No. 117, in 1998 House Journal, at 999.

Second, the legislature intended to reduce litigation costs. In 2000, HRS § 431:10C–308.5(b) was amended, in relevant part, to add the provisions related to the selection of the *independent* medical examiner, with the preference for mutual selection by the claimant and the insurer. *See* 2000 Haw. Sess. L. Act 138, § 2, at 270. The Conference Committee reported that the bill was intended

to establish a fair selection process that *favors selection by agreement. Where the parties are unable to agree, a neutral forum* (Department of Commerce and Consumer Affairs, arbitration, or circuit court) *will make the selection.* It is emphasized that the selection *should not be a perfunctory matter,* but that every effort should be made to *select a neutral examiner with a balance [sic] approach that favors neither insurer or [sic] claimant.* Those examiners who have acquired reputations for favoring one side or the other should not be selected. *Examiners ... that do not rely heavily on IME income that might affect bias,* are to be favored.

Hse. Conf. Comm. Rep. No. 37, in 2000 House Journal, at 865 (emphases added). As with the 1992 and 1998 amendments, the House Committee on Consumer Protection and Commerce related that "the intent of this measure is to *promote judicial economy, conserve administrative resources, and streamline the resolution of disputes.*" Hse.

---

**16.** Similarly, the Conference Committee considering the bill announced that its "purpose ... [was] to amend the no-fault [insurance] law with the intent of *reducing and stabilizing the soaring cost of motor vehicle insurance*[.]" Sen. Conf. Comm. Rep. No. 161, in 1992 Senate Journal, at 825 (emphasis added). The Conference Committee also reiterated the original intent behind the no-fault insurance scheme, "to keep ninety per cent of motor vehicle accident victims out of the tort recovery system while providing them with adequate and fair benefits." *Id.* at 826.

**17.** The Senate Committee on Commerce, Consumer Protection, and Information Technology reported that the bill "[l]imits charges for [IMEs]

to work that includes record reviews, physical examinations, history taking and reports[.]" Sen. Stand. Comm. Rep. No. 3143, in 1998 Senate Journal, at 1276. However, as noted before, the reach of HRS § 431:10C–308.5(b) is limited. The Conference Committee reported that those limitations were "designed to eliminate abuses and excessive charges associated with [IMEs]. The bill clarifies that the workers' compensation fee schedule charge allowable for IMEs may *not be exceeded by submitting a separate charge for the report or other ancillary procedures incident to the conducting of an IME.*" Hse. Conf. Comm. Rep. No. 117, in 1998 House Journal, at 1000 (emphasis added).

Stand. Comm. Rep. No. 639–00, in 2000 House Journal, at 1209 (emphasis added).

As recognized in oral argument in the instant case, a record review may be a sufficient basis for a determination of whether or not the medical treatment being claimed is appropriate and reasonable. The selection of a neutral examiner in such circumstances would obviate much of the controversy that was engendered in this case. However, the treatment of a record review as an event independent from that of a physical examination in the definition of IME in HRS § 431:10C–308.5(b) would require legislative amendment. Such an amendment would be in keeping with the objective of "promot[ing] judicial economy, conserv[ing] administrative resources, and streamlin[ing] the resolution of disputes." Hse. Stand. Comm. Rep. No. 639–00, in 2000 House Journal, at 1209.